**TEXTRON, INC.**

v.

**AETNA CASUALTY AND SURETY COMPANY et al.**

**No. 98–138–Appeal.**

Supreme Court of Rhode Island.

Feb. 10, 1999.

John Tarantino, Providence, James W. McKay, for plaintiff.

Mark Lavioe, Dominic Shelzi, East Greenwich, Kenneth P. Borden, Robert D. Parrillo, Paul V. Reynolds, George M. Vetter, Thomas C. Angelone, William M. Heffernan, Stephen H. Burke, Barbara S. Cohen, Brooks R. Magratten, Timothy P. Gallogly, Andrew B. Prescott, Providence, Shelia High King, Steven M. Richard, Providence, Mark T. Reynolds, Peter McNamara, for defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

GOLDBERG, J.

This appeal arose from a trial justice's grant of partial summary judgment on behalf of several defendant insurance companies in an action filed by the plaintiff, Textron, Inc. (Textron). In August 1987, this lawsuit was born, and in June 1988, Textron filed a third amended complaint in the Superior Court against approximately forty insurance companies for reimbursement costs associated with environmental cleanups of multiple sites scattered across the continental United States.[1] In seeking reimbursement, Textron alleged that the defendants wrongfully refused to make payments on primary and excess liability insurance policies purchased by Textron from the carriers.

The polemical policies, for the years 1960 through 1986, provided coverage to Textron for environmental cleanups and other environmental liabilities. Although the instant complaint dealt with several sites, the issues presented to us on appeal concern only Textron's claims against those insurance companies from which it purchased general liability policies[2] for its "Gastonia" site, located in Gastonia, North Carolina.[3]

A cleanup program at the Gastonia site was instituted as a result of Textron's detection of contaminants when underground storage tanks were removed from the site. Once the contamination was discovered, Textron took the appropriate steps to notify the proper authorities and sought to establish a cleanup program. Textron initially funded the cleanup program and now seeks reimbursement from the insurance carriers. However, their plans for reimbursement were thwarted by the trial justice when he granted partial summary judgment on behalf of defendants.[4] Textron now appeals this judgment.[5]

1. When this appeal was filed, among the defendant insurance companies were the following entities: Hanover Insurance Company, Commercial Union Insurance Companies, London Market Insurers, Home Insurance Company, Allstate Insurance Company, Associated International Insurance Company, American Home Assurance Company, American International Underwriters, Inc., Granite State Insurance Company, Lexington Insurance Company (US), Lexington Insurance Company (UK), and National Union Fire Insurance Company of Pittsburgh (collectively carriers). Several insurance companies were granted partial summary judgment and thus made part of this appeal, however, they have settled the claims with Textron prior to oral argument.

2. It is undisputed that all policies at issue contain essentially the same trigger-of-coverage language, which is similar to the language in CPC *International, Inc. v. Northbrook Excess & Surplus Insurance Co.*, 668 A.2d 647 (R.I.1995). *See infra.*

3. The term complaint is used to encompass all amended complaints, as well as the original complaint. Textron's Homelite Facility, known as the "Gastonia" site, was added to Textron's third amended complaint in June of 1988, following discovery of the contamination at that site.

4. Final judgment was entered pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure.

5. The insurance carriers suggest that this case is very similar to *Truk–Away of Rhode Island v. Aetna Casualty & Surety Co.*, 723 A.2d 309 (R.I. 1999), which was on simultaneous appeal to this Court. The insurance companies in *Truk–Away* were granted summary judgment several months before the insurance companies in this case were granted summary judgment. Similarly, *Truk–Away* was heard on oral argument by this Court immediately preceding *Textron, Inc.* Both cases turn on the trigger-of-coverage standard employed by the trial court; moreover, counsel for defendant, Commercial Union Insurance Company, indicated before this Court and the trial court

## Facts and Travel

This toxic tale has its origins in the soil of a North Carolina manufacturing plant. Textron owned and operated a manufacturing facility known as the "Gastonia" facility, which was managed through Textron's Homelite Division (Homelite).[6] Because of the nature of the materials used to manufacture equipment, production required the use of several degreasing solvents including: trichloroethylene ("TCE"); trichloroethane ("TCA"); and methyl ethyl ketone ("MEK"). Accordingly, these types of solvents had been an integral part in the operation of the Gastonia plant, including manufacturing, finishing, and assembling precision parts. To safely contain these metal waste materials and other organic liquids, the Gastonia site maintained both underground and aboveground storage facilities.

In 1986, in response to impending state and federal regulations concerning underground storage tanks,[7] the North Carolina Department of Natural Resources and Community Development ("NCDNRCD") made inquiries of all underground storage tank users for the purpose of insuring compliance with the soon-to-be-effective regulations. Shortly after receiving notification from NCDNRCD, Sloan Robinson, the Director of Facilities Planning for Homelite, suggested that the Gastonia tanks be removed in order to avoid the risk of accidental spillage or leakage, which would result in contamination. Accordingly, an excavation and extraction plan was established by Homelite in conjunction with Four Seasons, an industrial contractor. Beginning on January 6, 1988, the underground storage tanks were removed in accordance with the plan, whereupon contamination was discovered. It became obvious that the storage receptacles used at the site ultimately proved to be porous, and that the solvents had percolated into the surrounding soil. The analysis of the samples revealed the presence of volatile organic compounds (VOCs), which by the spring of 1988, required the removal of approximately 1,500 cubic yards of contaminated soil. Upon discovering the presence of this contaminated on-site soil, Homelite notified the state's Environmental Management Department.

Recognizing the likelihood that the massive amount of contaminated on-site soil could lead to off-site contamination, off-site tests were performed to determine whether, and to what extent, the contamination had migrated to the subsurface environment. Subsequently, on April 28, 1988, VOCs were discovered in off-site water wells. In May and June of 1988, additional testing was conducted by the Gastonia County Department of Health, which revealed some trace elements and contamination of private wells in the Meadowbrook subdivision, a neighborhood adjacent to Homelite. Once it was determined that the wells were contaminated, the state notified the nearby residents who were being serviced by the contaminated wells. As a result of the widespread contamination, and in an effort to rectify it, Homelite installed a temporary water line to provide water to local residents who were formerly serviced by the contaminated water sources.[8] Textron alleged that it spent millions of dollars in connection with the contamination found at the Gastonia site, and sought reimbursement under the insurance policies issued by defendant carriers. When the insurance carriers refused to make payments on Textron's claims, this suit commenced. Having determined that there was insufficient evidence to raise a genuine issue of material fact, the trial justice granted

---

that he had considered a certain quote by Yogi Berra that was particularly applicable to the current situation. He said "[t]his is [sic] déjà Yogi all over again." This statement was made presumably in the hope that we would defer to the trial court's determination in *Truk–Away*. We note, however, that neither the facts of this case, nor the law, call for a collective resolution. Finally, if we were to assign one of Yogi Berra's familiar adages to this litigation, it would more likely be "[i]t ain't over 'til it's over!" *See* Yogi Berra, *The Yogi Book*, 121 (1998).

6. The facility has been in operation since 1957.

7. The proposed environmental regulations were to become effective in 1988.

8. The record indicates that the temporary connection was made from Homelite's facility to the Dockery Water System, which is privately owned, and which drew its water from the community wells found to be contaminated.

summary judgment on behalf of the carriers, which Textron now appeals. Additional facts will be provided as needed throughout this opinion.

### Standard of Review

■ It is well settled that this Court reviews the granting of a summary judgment motion on a de novo basis. *See Marr Scaffolding Co. v. Fairground Forms, Inc.,* 682 A.2d 455, 457 (R.I.1996). In conducting such a review, we are bound by the same rules as those applicable to the trial justice. *See Rotelli v. Catanzaro,* 686 A.2d 91, 93 (R.I. 1996). Accordingly, we will affirm a trial justice's grant of summary judgment if, after reviewing the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences from that evidence in support of the nonmoving party's claim, we conclude that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of the controlling law. *See Avco Corp. v. Aetna Casualty & Surety Co.,* 679 A.2d 323, 327 (R.I. 1996); *see also Volino v. General Dynamics,* 539 A.2d 531, 532–33 (R.I.1988).

■ This Court often has declared that summary judgment is a harsh remedy that must be cautiously applied. *See Avco Corp.,* 679 A.2d at 327; *see also Mallette v. Children's Friend and Service,* 661 A.2d 67, 69 (R.I.1995); *McPhillips v. Zayre Corp.,* 582 A.2d 747, 749 (R.I.1990). The party opposing a motion for summary judgment cannot rely exclusively on mere allegations or on blanket denials contained in the pleadings. *See Avco Corp.,* 679 A.2d at 327; *see also Hydro–Manufacturing, Inc. v. Kayser–Roth Corp.,* 640 A.2d 950, 954 (R.I.1994). Consequently, the nonmoving party must affirmatively set forth facts that raise a genuine issue to be resolved by the factfinder. *See Hydro–Manufacturing, Inc.,* 640 A.2d at 954. *See also* Super.R.Civ.P. 56(e).

In the present case, the trial justice was unable to find that Textron had raised a genuine issue of material fact concerning trigger-of-coverage. In making this determination, the trial justice noted that although there were "excellent theories" brought forward by Textron, there was no scientific

evidence to justify the ultimate conclusions reached by its expert. Clearly, the trial justice relied heavily on his conclusion that both parties acknowledged that contamination was not actually discovered until May of 1988, approximately two years after the policies had expired.

After careful review of the evidence, we conclude that in granting the carriers' motion for summary judgment, the trial justice improperly interpreted *CPC International, Inc. v. Northbrook Excess & Surplus Insurance Co.,* 668 A.2d 647 (R.I.1995), to provide for a single trigger-of-coverage criterion under an occurrence-based liability policy, that single test being when the damage was actually discovered. Despite the trial justice's perception of a single test holding in *CPC,* in that case we enumerated a test consisting of three parts, each of which independently triggers liability coverage under an occurrence-based policy. *Id.* at 649. Because we conclude that liability under the policy may be established by one of the recognized *CPC* tests, we need not address the continuous trigger-of-coverage standard.

### The *CPC* Standard

In determining whether summary judgment is proper in this case, it is essential to have an understanding of *CPC International, Inc.,* which is the controlling law in this jurisdiction. *CPC* came before us as a certified question from the United States Court of Appeals for the First Circuit seeking a determination of what trigger-of-coverage standard we would adopt to determine when an "occurrence" causing "property damage" took place within the meaning of the applicable insurance policy provisions. 668 A.2d at 647.

In *CPC,* the defendant, Northbrook Excess & Surplus Insurance Co. (Northbrook), issued a $25 million excess-liability policy to CPC International, Inc. (CPC International), effective from July 1, 1979 to July 1, 1980. *Id.* CPC International was a New Jersey packaging and manufacturing corporation. The Peterson/Puritan aerosol-packaging plant was a subsidiary of CPC International since 1968 and was located in Cumberland, Rhode Island, along the Blackstone River.

*Id.* at 647–48. Among other potentially poisonous products, Peterson/Puritan manufactured flea spray, hair spray, spot remover, and oven cleaner. During the years of 1963 through the late 1970s, employees routinely dumped chemicals into the septic systems of the Peterson/Puritan plant, and in 1974, an accidental rupture of a storage tank resulted in a massive spill of over 6,200 gallons of perchloroethylene into the soil at the Peterson/Puritan plant. At the time of the spill, CPC International denied any resulting contamination of nearby water supplies. Subsequently, in October of 1979, during the Northbrook policy period, Cumberland and the neighboring town of Lincoln, discovered contamination in their municipal water wells. Following this unsettling revelation, the wells were closed.

During all relevant times, Northwestern National Insurance Company (Northwestern)ʼ was CPC Internationalʼs primary insurer with a coverage limit of $1 million. Once the Northwestern coverage was exhausted, CPC International turned to Northbrook to indemnify it for the remaining expenses associated with the cleanup. Northbrook denied liability under the policy, arguing that the property damage actually had occurred either before or after (but not during) the period the policy was in place, and therefore, coverage was not triggered. CPC International rejected this argument, and instead argued that the actual discovery of the well-field contamination was in October 1979, during the policyʼs effective period, thereby triggering coverage under the Northbrook policy. *Id.*

In July 1987, CPC International filed suit against Northbrook in New Jersey state court seeking a declaration that Northbrook must indemnify it for cleanup costs and other damages. This case eventually was removed to the United States District Court for the District of Rhode Island based on diversity jurisdiction, where the court adopted Northbrookʼs position that the appropriate trigger-of-coverage was when the aquifer was actually damaged. Consequently, the court granted Northbrookʼs motion for judgment as a matter of law. *Id.* Accordingly, the District Court held that coverage was not triggered

because the triggering event occurred outside the policy period. *Id.* at 648–49. CPC International sought appellate review. The Court of Appeals for the First Circuit attempted to reconcile the trigger-of-coverage test, however, given the lack of any definitive Rhode Island case law on the issue, the court was unable to do so. Consequently, the First Circuit sought guidance from this Court through a certified question. *Id.* at 649. The question asked us to resolve, under Rhode Island law, when there has been an "occurrence" sufficient to trigger coverage under a general liability policy. The certified question stated:

> "What trigger-of-coverage standard would the Rhode Island Supreme Court use for determining at what point an 'occurrence' causing 'property damage' took place, within the meaning of the insurance policy provisions provided in the separate opinion in this case, where an insured alleges that a spill of hazardous contaminants in 1974 migrated through the groundwater, causing immediate injury to the pertinent property, which was not, in fact, discovered, however, until at least 1979?" *Id.* at 647.

"We answer[ed] that an 'occurrence' under a general liability policy takes place when property damage, which includes property loss, manifests itself or is discovered or in the exercise of reasonable diligence, is discoverable." *Id.* at 649. This test is the appropriate standard that should have been applied by the trial justice in this case in order to determine whether a genuine issue of material fact existed to defeat the insurance carriersʼ motion for summary judgment. By failing to apply this test, we determine that the trial justice has misapplied the *CPC* standard and erroneously granted summary judgment. Although the *CPC* case addressed a situation wherein the damage manifested itself and was discovered during the policy period, and therefore triggered coverage, *CPC* does not stand for the proposition that the damage actually must be discovered to trigger coverage. Rather, *CPC* includes circumstances in which property damage is discoverable in the exercise of reasonable diligence as a trigger of coverage.

## Analysis

■ As indicated above, *CPC* sets forth three tests that trigger coverage under a general liability policy, when the property damage: (1) manifests itself; (2) is discovered; or (3) in the exercise of reasonable diligence is discoverable. *CPC*, 668 A.2d at 649. The trial justice in this case considered only the "discovered" trigger of this test and found no evidence to indicate that any damage actually was recognized at any time prior to 1988. It was error, however, for the trial justice to bring this analysis to a premature conclusion by refusing to acknowledge the remaining two triggers enumerated in the *CPC* case. Therefore, we shall do so at this time.

■ This case requires us to determine, in the light most favorable to the nonmoving party, if the evidence presented raises a genuine issue of material fact. *Avco Corp.*, 679 A.2d at 327. We conclude that it does. The affidavit of Textron's expert setting forth the probable existence of property damage, read together with affidavits provided by former and current employees at the Gastonia site indicating the occurrence of leaks and spills during the policy period, creates a genuine issue of material fact concerning whether the contamination was discoverable in the exercise of reasonable diligence during the policy period, notwithstanding the fact that it was not actually discovered.

The motion for summary judgment was heard over two days. During the first appearance, the trial justice entertained Textron's argument that *CPC* provided three alternate theories of coverage, any one of which would trigger coverage under the policy. Acknowledging the uncontroverted evidence that the damage was discovered at a point outside of the policy period, Textron suggested that the contamination could have been discovered during the policy period with the exercise of reasonable diligence. In contemplation of Textron's theory, the trial justice invited Textron to "give me an affidavit

from an expert that says [that the damage was discoverable]." Approximately three and one-half months later, the parties appeared before the trial justice once again, only this time Textron was armed with an affidavit signed by its expert, Bryson D. Trexler, Jr., Ph.D., P.G.

Where a plaintiff can show through credible evidence, such as the affidavit of an expert witness, that property damage occurred sometime during the relevant policy period, the court should accept this as dispositive. *See Gelman Sciences, Inc. v. Fidelity and Casualty Company of New York*, 456 Mich. 305, 572 N.W.2d 617, 625 (Mich.1998). In the case at bar, the affidavit submitted by Dr. Trexler stated that in his "expert opinion to a reasonable degree of scientific certainty, ground water contamination beneath, and off-site of, the Gastonia facility manifested itself or was discoverable prior to 1960 and *** every year thereafter." To support this conclusion, Dr. Trexler relied on several sources of information, including review of soils, hydrogeology, average monthly rainfall amounts in the vicinity of Gastonia, scientific data, and an analysis of waste water containing solvents that had seeped into the surface soils. Through his research, Dr. Trexler determined that since 1957, the waste water management system at the Gastonia facility consisted, in part, of unlined sludge-drying beds. In addition, episodic spills and leaks occurred in a host of areas at the Gastonia facility. Doctor Trexler determined that the flow of contaminants, and the rate in which the waste water ultimately reached the aquifer system servicing neighboring communities, could be determined mathematically.[9] Based on these calculations, Dr. Trexler determined that the ground water beneath the Gastonia facility was polluted within thirty days after the discharge of waste water. He further determined that the VOCs migrated off-site and impacted off-site ground water one to two years after the on-site ground water was impacted. Based upon this information and the facts available to him, Dr.

9. The equation to determine the time of travel is a function of seepage velocities and retardation factors. The use of a retardation factor creates a conservative approach to determine contaminant travel time because it assumes that the solvents alone are absorbed into the soil and rock, and that no bacterial or other chemical breakdown, or dilution of solvent contaminants, are occurring.

Trexler determined that "[p]roperty damage in the form of off-site ground water contamination in the vicinity of the Gastonia facility, physically existed and was discoverable in the late 1950s and in every year thereafter to today ." [10] Through his affidavit, Dr. Trexler assured the trial court that the method to determine whether there was off-site ground water contamination could "be accomplished simply by collecting and analyzing a ground water sample." The evidence of the occurrence as presented in Dr. Trexler's affidavit provides credence to Textron's argument that the contamination was present in on-site soil, as well as off-site soil and groundwater, before and during the policy period.

Textron's burden, however, is not met by merely establishing evidence to suggest that the contamination was present during the policy period. Rather, *CPC* requires that the contamination not only exist during the period of coverage, but also be discoverable in the exercise of reasonable diligence. *CPC,* 668 A.2d at 649. In other words, in order to trigger coverage in the absence of actual discovery, Textron must have had some reason to test for the contamination, and must actually have been able to discover it in the exercise of reasonable diligence. In an effort to meet its burden, Textron presented three affidavits from current or former employees of the Gastonia facility who had personal knowledge of overflow and other leaks of solvents at the Gastonia site. Charles White (White) indicated that "[i]n the 1970s, a vendor accidentally overfilled an aboveground solvent storage tank at the Gastonia facility," and in "approximately the mid to late 1970s, as was the regular practice in the industry at this time, an unlined waste water lagoon was located south of the waste water treatment plant area." Also, Clarence Hill (Hill), provided evidence that he had personal knowledge that "[a]ccidental leakage of liquids from valves and pumps occasionally resulted in releases of liquid in between inspections and maintenance of the tanks and associated equipment," and that "[i]n the late 1970s, a vendor accidentally overfilled an aboveground solvent storage tank." Hill also confirmed the existence of a waste water lagoon located south of the waste water treatment plant that contained treated industrial waste water. Finally, Sloan Robinson (Robinson), the Director of Facilities Planning for Homelite, provided substantially similar information as White and Hill, and added "unintentionally, spills and leaks from degreasing units, storage drums, and other containers occasionally occurred, particularly during transfer from one container to another." Robinson was employed at the Gastonia facility from 1959 until 1975, and therefore had personal knowledge of the solvents used on-site.

Events such as these presumably would provide Textron with notice of possible contamination, and indeed could cause a person exercising reasonable diligence to test for, and to discover, soil and groundwater contamination. Read together, in the light most favorable to the nonmoving party, the affidavits of Dr. Trexler, Robinson, White, and Hill raise a genuine issue of material fact, specifically whether the contamination was discoverable with the exercise of reasonable diligence during the policy period in order to trigger coverage. We conclude that Textron presented sufficient evidence to submit to the jury the question of whether or not the contamination was discoverable with the exercise of reasonable diligence.

For the foregoing reasons, the plaintiffs appeal is sustained. The judgment appealed from is vacated and the papers in this case are remanded to the Superior Court for further proceedings consistent with this opinion.

---

10. To support his theory that the contamination occurred before it was discovered in 1988, evidence was offered to show that TCE was used from 1957 until some time between 1973 and 1974 for cleaning and degreasing. The use of TCE subsequently was phased out and initially replaced by TCA, and then replaced by detergent and water in 1989. The presence of TCE in contaminated soil that was tested in 1988, therefore, suggests that the soil was contaminated by TCE prior to 1974, since the solvent was no longer used after that year.