TEXTRON, INC.

v.

**AETNA CASUALTY AND SURETY
COMPANY et al.**

No. 98–357–Appeal.

Supreme Court of Rhode Island.

June 22, 2000.

John Tarantino, James W. McKay, Providence, Eugene R. Anderson, Robert M. Horkovich, Edward J. Stein, Anderson Kill & Olick, P.C., New York City, for plaintiff.

Kenneth P. Borden, Robert D. Parrillo, John W. Kershaw, George M. Vetter, R. Kelly Sheridan, Harry W. Asquith, Jr., William M. Heffernan, Stephen H. Burke, Mark C. Hadden, Andrew B. Prescott, Providence, Shelia High King, Boston, MA, Dominic Shelzi, East Greenwich, Michael P. Duffy, Boston, MA, James Ackerman, Michael Sommerville and Mark B. Lavoie, Boston, MA, for Aetna Casualty & Surety Co.

Mark T. Reynolds, Providence, P. McNamara, for Allstate.

Michael A. Kelly, Gerald John Petros, Providence, for Cumberland Farms.

Alan Shoer, Providence, for D.E.M.

Michael P. Duffy, Boston, MA, Laura Foggan, Daniel Troy, Washington, DC, for Insurance Environmental Litigation.

John W. Kershaw, Providence, for John R. Ludbrooke & London Market.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

Insurance coverage for a manufacturer's pollution-cleanup costs forms the declaration page of this appeal. A Superior Court motion justice granted partial summary judgment in favor of the defendant-insurer, Insurance Company of North America (INA), and against the plaintiff-insured, Textron, Inc. (Textron), ruling that no insurance coverage existed under the circumstances of this case. Textron argues on appeal that the motion justice: (1) incorrectly applied the trigger-of-coverage doctrine that we formulated in *CPC International, Inc. v. Northbrook Excess & Surplus Insurance Co.*, 668 A.2d 647 (R.I. 1995) (*CPC I*) and (2) erred in holding that the pollution-exclusion clauses in the insurance polices at issue precluded coverage for the type of gradually occurring damage in question (namely, the eventual contamination of groundwater as a result of chemical seepage from a so-called neutralization pond that Textron maintained at its Wheatfield, New York, plant site). For the reasons unearthed below, we reverse, vacate the summary judgment, and remand for further proceedings consistent with this opinion.

### Facts and Travel

From 1960 to 1973, Textron, a manufacturer of aerospace equipment, leased an eighty-acre manufacturing site in Wheatfield, New York from Bell Aircraft Corporation (Bell). In 1973 it bought the property from Bell and, until 1987, it continued to use this site for manufacturing a wide range of aerospace-related equipment, including helicopter components, aircraft prototypes, and rocket-propulsion hardware. During its long-term use of the site, Textron's manufacturing processes generated toxic chemical wastes. To capture, contain, treat, and neutralize these wastes, it employed an artificial holding pond at the site as a waste receptacle and depository. After treating these wastes, Textron would release them into the site's sanitary-drainage system. However, unbeknownst to Textron, some of this toxic waste gradually seeped from the pond and, over the years, contaminated or contributed to the contamination of the surrounding groundwater.

During the 1980s the Environmental Protection Agency (EPA) charged Textron with polluting dozens of sites across the United States, including Wheatfield. As a result, the EPA sued Textron under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 to 9675 (CERCLA), a strict-liability statute that allows the EPA either to demand that responsible parties voluntarily clean up polluted sites or else reimburse the EPA for its costs in conducting the cleanup operations. Textron, in turn, filed suit in August 1987 against approximately thirty of its own comprehensive general-liability insurers and excess-insurance carriers, including the present defendant, INA, seeking coverage for the site-cleanup costs. Because Textron has settled its claims with all of its other insurers that moved for summary judgment, INA is the only remaining defendant on this appeal.

The policies INA sold to Textron for 1979–81 and 1984–86 contained the following so-called pollution-exclusion clause:

"This insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soots, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply *if such discharge, dispersal, release or escape is sudden and accidental.*" (Emphasis added.)

The policy INA provided to Textron for the period 1982–84 stated as follows:

"This insurance does not cover liability for: (1) Personal Injury or Bodily Injury or loss of, damage to, or loss of use of property directly or indirectly caused by seepage, pollution or contamination, provided always that this paragraph (1) shall not apply to liability for Personal Injury or Bodily Injury or loss of or physical damage to or destruction of tangible property, or loss of use of such property damaged or destroyed *where such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this Insurance.*"

"(2) The cost of removing, nullifying or cleaning-up seeping, polluting or contaminating substances *unless the seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening* during the period of this Insurance." (Emphases added.)

For the period from 1963 to 1966, INA also issued to Textron an umbrella policy (that is, a policy that offered protection for losses in excess of the amounts covered by Textron's other liability insurance and that filled certain other gaps in coverage, *see Fratus v. Republic Western Insurance Co.,* 147 F.3d 25, 27 (1st Cir.1998)). This policy did not contain a pollution-exclusion clause.

The Superior Court granted partial summary judgment in favor of INA on Textron's claim for cleanup costs at the Wheatfield site based upon its determination that (1) these costs did not trigger coverage under the three-part test that this Court set forth in *CPC I,* and (2) for INA policies issued from 1979 to 1981, 1982 to 1984, and from 1984 to 1986, the incorporated pollution-exclusion clauses barred coverage because no temporally sudden event at the site caused the damage. Textron has appealed from that judgment.

## Standard of Review

This Court reviews the grant of a summary judgment motion de novo. *See Marr Scaffolding Co. v. Fairground Forms, Inc.,* 682 A.2d 455, 457 (R.I.1996). The Superior Court should grant summary judgments " 'sparingly [and] only when a review of all pleadings, affidavits, and discovery materials properly before the court demonstrates that no issue of fact material to the determination of the lawsuit is in genuine dispute.' " *Doe v. Gelineau,* 732 A.2d 43, 47–48 (R.I.1999). In reviewing a grant of summary judgment, we view the evidence in the light most favorable to the nonmoving party. *See Nichols v. R.R. Beaufort & Associates, Inc.,* 727 A.2d 174, 176 (R.I.1999).

## Analysis

### I

### Trigger of Coverage

Textron argues that the Superior Court erroneously granted partial summary judgment in favor of INA because it misread this Court's *CPC I* decision. According to Textron, the Superior Court wrongly construed *CPC I* as delineating only a single trigger of coverage for environmental property damage: namely, whether the insured discovered the damage during the policy period. In fact, Textron asserts, the holding in that case provided for three alternative triggers, one of which was a discoverability trigger: that is, whether by exercising reasonable diligence the insured could have discovered the environmental damage during the policy period. We later clarified this particular coverage trigger in *Textron, Inc. v. Aetna Casualty and Surety Co.,* 723 A.2d 1138 (R.I.1999) (*Textron–Gastonia*). There, we held that "discoverable in the underlying exercise of reasonable diligence" meant that (1) the property damage occurred during the policy period, (2) the property damage was capable of being detected, and (3) the insured had reason to test for the property damage. *See id.* at

1144. Nonetheless, the motion justice chose not to apply the discoverability trigger in this case because, he concluded, its reasonable-diligence standard was "inappropriate in this kind of a case." INA, on the other hand, asserts that, whether the motion justice misapplied the *CPC I* test was irrelevant because Textron failed to meet its burden of proving that, by exercising reasonable diligence, it would have discovered the damage during INA's policy period. We disagree.

■ Property damage triggers coverage under this type of comprehensive general-liability-insurance policy when the damage (1) manifests itself, (2) is discovered or, (3) in the exercise of reasonable diligence is discoverable. *See CPC I*, 668 A.2d at 649. We agree with Textron that the motion justice's refusal to apply the third trigger of the *CPC I* test did indeed misconstrue that holding, as amplified by our later ruling in *Textron–Gastonia*, 723 A.2d at 1143–44. The third trigger of the *CPC I* test does not force a manufacturer to "go around looking to find out if he's contaminating anything," as the motion justice supposed. Instead, it simply addresses the problem of latent injury (such as asbestos poisoning) or latent damage (such as groundwater contamination), when the injury or damage, although covered by the policy, is not immediately discernible or occurs after an unexpected event sets in motion a series of incidents that eventually results in the manifestation of the damage. Moreover, the "discoverability" trigger in *CPC I* descends from a long and venerable line of insurance cases. *See, e.g., American Home Assurance Co. v. Libbey–Owens–Ford Co.*, 786 F.2d 22, 30 (1st Cir. 1986) (holding that the trigger event for damages resulting from falling windows occurred when the architect informed the owner of the building that the windows were defective and that they posed a "clear and present danger to the public," because this disclosure would have put a reasonable person on notice that this problem existed). Thus, contrary to the motion justice's belief, applying the "discoverability" trigger to cases like this one is not anomalous.

In *CPC I*, the First Circuit certified to this Court a question about triggers of insurance coverage under Rhode Island law. *See CPC I*, 668 A.2d at 647. In *CPC I*, a plaintiff-manufacturer that routinely dumped toxic chemicals into the drains and septic system of its plant sued its insurer for recovery of cleanup costs under a policy that ran from 1979 to 1980. *See id.* at 648. In 1979, during the period covered by the defendant's policy, state investigators discovered that the chemicals had contaminated municipal water supplies. *See id.* The insurer argued that the coverage-triggering "occurrence" was either the plaintiff-manufacturer's routine dumping, or a 1974 massive toxic spill. The insurer argued that the massive spill occurred outside the policy period. *See id.* The manufacturer, however, contended that the 1979 discovery of the contamination should have been the "occurrence" that triggered coverage. *See id.*

Unsure of and yet bound to apply Rhode Island law to the controversy before it, the First Circuit asked this Court to determine when there has been "an 'occurrence' sufficient to trigger coverage under a general liability policy when the insured sustains a chemical spill that results in a property loss that is not discovered until years after the spill took place." *Id.* at 649. This Court answered that "an 'occurrence' under a general liability policy takes place when property damage * * * manifests itself or is discovered or in the exercise of reasonable diligence, is discoverable." *Id.*

■ Here, the evidence on summary judgment indicated that a genuine issue of material fact existed concerning whether Textron could meet the "discoverable by reasonable diligence" aspect of *CPC I* and *Textron–Gastonia*. First, the record contains evidence that damage not only existed but also was capable of being detected during the policy periods, 1979–81, 1984–

86, 1982–84, and perhaps even during the 1963–66 period covered by the umbrella policy. P. Michael Terlecky, Jr. (Terlecky), the hydrogeologist who supervised environmental investigations at Textron's Wheatfield site, stated in his affidavit that "the groundwater, soil, sediments, and other materials such as bedrock became contaminated at the Wheatfield Site and such contamination was discoverable as early as 1960, [and that] new property damage arose in each and every year thereafter." Florin Gheorghiu, a geoscientist who worked at Textron's Wheatfield site from 1989 through 1992, stated in an affidavit that it would take contaminated water about fifty-four days to seep downward through soil and reach bedrock. This expert also indicated that, using simple analysis of groundwater samples, Textron could have discovered contamination at the neutralization pond from the time it first began using it in 1960.

Finally, with respect to the question of whether Textron had reason to test for environmental damage during the policy period, expert affidavits suggested that it did. For example, Terlecky asserted that there were "small leaks and spills during transfer of metal parts and leakage through cracks in the concrete" of a building used since 1956 for solvent degreasing and for acid treatment of metal parts. *See Textron–Gastonia,* 723 A.2d at 1144 (holding that knowledge of overflow and other leaks of solvents at the site provided the insured with reasons to test for contamination). Another Textron employee testified that sudden and accidental spills of the chemicals that later ended up in the groundwater "certainly" occurred. Employees also testified that Textron used concrete "pads" from the rocket cell-testing area into the neutralization pond to catch accidental spills and leaks, and that these ramps themselves had cracks that allowed toxic chemicals to leak from them onto the ground. Thus, the same toxic chemicals that later turned up in the groundwater had spilled or leaked accidentally at various times, arguably giving

Textron's engineers reasons to test for contamination. Indeed, according to their affidavits, they did, in fact, regularly conduct certain limited types of testing for contamination at the site.

In conclusion, Textron's specific allegations of site contamination amount to more than a mere assertion that it disposed of waste at the site. *See Truk–Away of Rhode Island, Inc. v. Aetna Casualty & Surety Co.,* 723 A.2d 309, 313 (R.I.1999) (holding that such a showing was inadequate to prove a triggering event). "Where a plaintiff can show through credible evidence, such as the affidavit of an expert witness, that property damage occurred sometime during the relevant policy period, the court should accept this as dispositive," *Textron–Gastonia,* 723 A.2d at 1143, at least for the purpose of creating a genuine issue of material fact on summary judgment. Textron introduced not only evidence of discoverable damage at the site during the policy period but also that it had reason to test for it. Thus, a genuine issue of material fact existed concerning whether this evidence met *Textron–Gastonia*'s three-prong test for whether the damage was discoverable in the exercise of reasonable diligence. Hence, the Superior Court erred in granting summary judgment when it declined to apply the discoverability trigger of coverage to the facts of this case.

## II

### The Pollution–Exclusion Clause

Textron also argues that genuine issues of material fact exist concerning the application of the policies' exceptions to the pollution-exclusion clause, particularly the "sudden and accidental" language used therein. First, it asserts that the word "sudden" in this exception can mean "unexpected," as opposed to "abrupt," and thus the policy can be construed to cover damages resulting from a gradual seepage of toxic chemicals from the containment pond. Textron also suggests that insur-

ance-industry records concerning the clause and its drafting history support a finding of coverage when the contamination was "unintended and unexpected," although not temporally abrupt. Textron maintains that it should have the opportunity to prove this theory at trial through the submission of pertinent insurance-industry documents. It further contends that a genuine issue of material fact exists concerning whether the artificial containment pond was intended to be a safe container for toxic waste or merely a convenient dumping slough. If, as Textron posits, the previous owner had built and enhanced the pond as a safe receptacle for contaminants, then the relevant discharges for purposes of this litigation may be the subsequent accidental discharges from the pond, rather than the initial placements of wastes in it. If Textron establishes that this was a true containment pond for toxic wastes, then the relevant seepage could prove to be "unintended and unexpected," thus falling under the "sudden and accidental" exception in the pollution-exclusion clause as Textron interprets it. Finally, Textron insists that even if the word "sudden" in the pollution-exclusion clause means only "abrupt," it has presented ample evidence of releases at the site other than those emanating from the neutralization pond that were abrupt and that could have contaminated the groundwater.

INA, on the other hand, asserts that the word "sudden" necessarily contains a temporal element, and thus it can apply only to events that happened abruptly, but not to gradual ones that are merely "unintended or unexpected," as Textron asserts. It adds that Textron has presented no evidence of temporally "sudden" discharges of waste at the Wheatfield site.

The meaning of the word "sudden" in this kind of pollution-exclusion clause is a matter of first impression in Rhode Island. Moreover, our examination of the relevant cases from other jurisdictions reveals no clear majority among state or federal courts concerning whether this word entails a temporal element. (Both sides claim to hold the majority view, but the numbers are close enough that any slight preponderance of one position over the other is not particularly meaningful.) As one court has colorfully described it,

> "The cases swim [in] the reporters like fish in a lake. The Defendants would have this Court pull up its line with a trout on the hook, and argue that the lake is full of trout only, when in fact the water is full of bass, salmon and sunfish too." *Pepper's Steel & Alloys, Inc. v. United States Fidelity and Guaranty Co.*, 668 F.Supp. 1541, 1549–50 (S.D.Fla.1987).

When we are asked to interpret contested terms in an insurance policy, "[t]he policy must be examined in its entirety and the words used must be given their plain everyday meaning." *McGowan v. Connecticut General Life Insurance Co.*, 110 R.I. 17, 19, 289 A.2d 428, 429 (1972). Moreover, we strictly construe any ambiguous policy language in favor of the insured. *See Bartlett v. Amica Mutual Insurance Co.*, 593 A.2d 45, 47 (R.I.1991).

## A. Ambiguity of the Word "Sudden"

Giving the word "sudden" its "plain everyday meaning" is no easy task. Both sides muster dictionary support of their respective positions, half of which accord a temporal meaning to the word and the other half of which give it the meaning of unexpected.[1] This diversity proves only

---

1. Because the parties cumulatively cite eight dictionaries in their briefs, we take the liberty of indulging in a brief etymological foray of our own. First, we note that the American Heritage Dictionary offers three meanings for the word "sudden:" "[h]appening without warning; unforeseen;" "[c]haracterized by hastiness; abrupt or rash;" and "[c]haracterized by rapidity; quick and swift." American Heritage Dictionary of the English Language, 1794 (3d ed.1996). Black's Law Dictionary defines "sudden" as "[h]appening without previous notice or with very brief notice; coming or occurring unexpectedly; unfore-

that the word's meaning is legitimately subject to different interpretations—in other words, that it is ambiguous. Moreover, this Court has also held that "diversity of judicial thought [as to the meaning of terms in an insurance contract] is proof positive" of ambiguity. *Zanfagna v. Providence Washington Insurance Co.,* 415 A.2d 1049, 1051 (R.I.1980). Here, a multitude of cases exists on both sides. Furthermore, a slim but persuasive majority of other jurisdictions holds that the word "sudden" in this type of clause is ambiguous; that is, it is susceptible to more than one reasonable interpretation, as Textron argues. *See Alabama Plating Co. v. United States Fidelity and Guaranty Co.,* 690 So.2d 331, 334 (Ala.1996) (per curiam) (noting that "[a] narrow majority of state supreme courts that have considered the meaning of the 'pollution exclusion,' * * * have held that the 'sudden and accidental' exception is ambiguous and must be construed in favor of the policyholder to provide coverage where migration of contaminants into the soil or groundwater was 'unexpected and unintended' "). *See also Queen City Farms, Inc. v. Central Nation-*

*al Insurance Co. of Omaha,* 126 Wash.2d 50, 882 P.2d 703, 727 (1994) (concluding that "these exclusions are ambiguous, and therefore should be construed against the drafter-insurer, to mean that if the polluting event is unexpected and unintended, coverage is provided").

▄ Under Rhode Island law, an ambiguous policy term should be construed in favor of coverage and against the insurer. *See Campbell v. Norfolk & Dedham Mutual Fire Insurance Co.,* 682 A.2d 933, 935 (R.I.1996) (holding that "[i]f the terms of an insurance contract are subject to more than one reasonable interpretation, the policy will be construed in favor of the insured to avoid forfeiture"); *Zanfagna,* 415 A.2d at 1051 (charging the fault for any ambiguity "to the insurer who selected the language"). Other jurisdictions have noted that this principle holds not only when the insured is an unsophisticated consumer, but also when, as here, the insured is a corporation that might presumably have more business acumen and bargaining power. *See Queen City,* 882 P.2d at 726.[2]

seen; unprepared for." Black's Law Dictionary, 1432 (6th ed.1990) (citing *Hagaman v. Manley,* 141 Kan. 647, 42 P.2d 946, 949 (1935)). The Seventh Edition of Black's Law Dictionary *does not define* "sudden" but does describe "pollution exclusion." *See* Black's Law Dictionary, 586 (7th ed.1999). The first meaning of the word "sudden" in the American Heritage Dictionary is "[h]appening without warning, unforeseen[,]" and its second and third denote a temporal element. In fact, the modern English word "sudden" is derived from the Latin verb "subire" meaning "to approach stealthily [or secretly]." American Heritage, 1794. The Oxford English Dictionary gives this example: "A sudden little river crossed my path As unexpected as a serpent comes." *Claussen v. Aetna Casualty & Surety Co.,* 259 Ga. 333, 380 S.E.2d 686, 688 (1989) (quoting Oxford English Dictionary, 96 (1933)). While the modern word certainly has acquired a secondary, temporal meaning, the original and still perfectly functional meaning of the word is happening without warning or anticipation. Thus, reading the word "sudden" in the context of insurance policies to mean "unexpected" not only harmonizes with its context but also remains true

to the word's original meaning. Our present interpretive problems with this word may arise from our modern forgetfulness that it is often used to describe a subjective state, that is, the mental state of the person visited by the event. In other words, even though a snake may have been slowly slithering toward a person, that person may still experience its appearance as temporally abrupt *because* it is unexpected. Thus, the temporal connotation given to "sudden" can arise from the subjective perception of an event and it does not denote necessarily any *objectively* temporal element.

**2.** To apply this principle to large corporations such as Textron makes more sense in the insurance-policy context than it might in other settings: while business customers of insurance companies may at first glance appear to have more power in negotiating an insurance contract, in fact the only negotiation that typically occurs over the policy language is that between state regulators and the insurers. *See Morton International, Inc. v. General Accident Insurance Co. of America,* 134 N.J. 1, 629 A.2d 831, 851 (1993). Often the commercial insured such as Textron does not even

When used in the context of an insurance policy's pollution-exclusion clause, the word "sudden," we hold, bars coverage for the intentional or reckless polluter but provides coverage to the insured that makes a good-faith effort to contain and to neutralize toxic waste but, nonetheless, still experiences unexpected and unintended releases of toxic chemicals that cause damage. Thus, coverage will be provided when the contamination was unexpected from the insured's standpoint: that is, when the insured reasonably believed that the waste-disposal methods in question were safe. The insured must show that it had no reason to expect the unintended damage and that it undertook reasonable efforts to contain the waste safely. In other words, a manufacturer that uses state-of-the-art technology, adheres to state and federal environmental regulations, and regularly inspects, evaluates, and upgrades its waste-containment system in accordance with advances in available technology should reap the benefits of coverage under our construction of this type of pollution-exclusion clause. But one that knowingly or recklessly disposes of waste without the necessary and advisable precautions will forfeit coverage under this clause. Thus, coverage will exist "[w]here the facts establish that materials were placed into a waste disposal site which was believed would contain or safely filter them, but, in fact, the materials unexpectedly and unintentionally are discharged or released into the environment, or disperse or escape into the environment * * *." *Queen City*, 882 P.2d at 726. Whether a manufacturer was an intentional or reckless polluter with respect to waste disposal or with respect to selecting a waste-disposal system, is, as here, usually a matter for fact-finding at trial and not for summary judgment.

Of course, we recognize that the two policies at issue here have slightly different language in their respective pollution-

exclusion clauses. While the 1979–81 and 1984–86 policies bar coverage unless the event is "sudden and accidental," the 1982–84 policy bars coverage for discharges unless they are caused by a "sudden, unintended and unexpected happening." However, we construe the language of the second policy to have the same legal meaning and effect as that of the first under the analysis we have employed above. *See Public Service Co. of Colorado v. Wallis and Companies*, 986 P.2d 924, 933 (Colo. 1999) (holding that "the phrase 'sudden, unintended and unexpected' [in the London pollution-exclusion clause] means 'unprepared for, unintended and unexpected' "). The language of the later policy follows the form of certain underlying insurance policies issued by Lloyd's of London. Courts have held that the language of pollution-exclusion clauses in Lloyd's policies is legally synonymous with the standard pollution-exclusion language. *See Olin Corp. v. Insurance Co. of North America*, 762 F.Supp. 548, 563 (S.D.N.Y. 1991) (finding "no meaningful difference" between the standard pollution-exclusion clause and the one at issue here). Though Lloyd's has argued that it never misrepresented the meaning of its clause to American insurance regulators, courts have held nonetheless that such clauses should not benefit from the misleading explanation of the standard pollution exclusion submitted to state regulators by American insurance companies. *Chemical Leaman Tank Lines, Inc. v. Aetna Casualty and Surety Co.*, 89 F.3d 976, 991 (3d Cir.1996).

Here, a genuine issue of material fact exists concerning whether Textron tried, albeit unsuccessfully, to contain the contaminants safely in the neutralization pond. Textron has offered evidence that it had established a "neutralization system," and had introduced chemicals into the pond to treat them. Textron's engineers

view the policy's language until after it pays the premiums. *See generally,* Nancer Ballard and Peter M. Manus, *Clearing Muddy Waters:*

*Anatomy of the Comprehensive General Liability Pollution Exclusion,* 75 Cornell L.Rev. 610, 621 (1990).

regularly tested the pond's waters to measure their pH level, and to monitor the neutralization process. Only after Textron deemed the toxins harmless did it release them from the pond. While Textron's engineers did not line the pond artificially, they testified that clay lining constituted the state-of-the-art sealant at that time, and that no existing regulation required or even recommended further lining. Engineering reports indicated that Bell, Textron's predecessor at the site, dug out the pond as a waste-containment strategy. And Textron's engineers assert that it enhanced the pond on the site to a "state of the art" toxic-containment level, while INA insists Textron merely used the pond "as is" to dump waste.[3] Therefore, competent evidence exists in this record, which, if credited by the factfinder, could support the conclusion that Textron was not a deliberate or reckless polluter. Hence, summary judgment was inappropriate.

**B. "Sudden" as Meaning Unexpected and Unintended in Light of Drafting History and Public Policy**

 Construing "sudden" as capable of meaning "unexpected" constitutes both a defensible reading of the pollution-exclusion clause's drafting history and sound public policy. First, we note that most courts that have examined the drafting history of the pollution-exclusion clause as an aid in its construction have found the word "sudden" to mean unexpected. The most thorough of these, and the one with the most dramatic result, is *Morton International, Inc. v. General Accident Insurance Co. of America,* 134 N.J. 1, 629 A.2d 831 (1993). In *Morton,* the New Jersey Supreme Court examined the history of the pollution-exclusion clause's incorporation into insurance contracts and found that, despite its literal terms, the clause should be taken as precluding coverage to

" 'the reckless polluter as well as the intentional polluter.' " *Id.* at 851. Despite arguments about the insurance industry's intent in drafting the pollution-exclusion clause, the *Morton* court held insurers to the meaning of the word "sudden" as the court deemed they had represented it to insurance regulators—that is, as a clarification of the insurers' intention to exclude only intentional polluters from coverage—rather than as a word having a strictly temporal meaning. *See id.* at 875–76.

Similarly, in *Alabama Plating Co.,* the Alabama Supreme Court found that the phrase "sudden and accidental" in the pollution-exclusion clause was sufficiently ambiguous to require an inquiry into the drafters' intent, and found that this history demonstrated that the drafters of the clause meant to provide coverage when environmental contamination was "unexpected and unintended." *Alabama Plating Co.,* 690 So.2d at 335–36. The court described its historical reasoning as follows:

> "Before the addition of the so-called 'pollution exclusion' to 'occurrence'-based * * * policies * * * it was clear that the policies provided coverage for gradually occurring environmental contamination. The evidence of the intent of the drafter of the 'pollution exclusion' clause, an insurance industry group that represented [many insurers], reveals that when the clause was added * * * it was * * * with an expressed intent that there would be *no reduction in coverage,* but that the addition of the exclusion was merely a 'clarification' that the policies did not provide coverage for intentional polluters." *Id.* at 335; see also *Claussen v. Aetna Casualty & Surety Co.,* 259 Ga. 333, 380 S.E.2d 686, 689 (1989) (holding that "[d]ocuments presented by

---

**3.** While it is technically true, as INA argues, that the pond preexisted Textron's presence at the site, this is because Bell, which occupied the Wheatfield site before Textron, had constructed the pond as a receptacle for waste.

Whether Textron was reckless in failing to test and/or to check out the pond's alleged containment features and how well they worked in practice remains a subject for further fact-finding.

the Insurance Rating Board * * * to the Insurance Commissioner when the 'pollution exclusion' was first adopted suggest that the clause was intended to exclude only intentional polluters").

The *Alabama Plating* court also noted that the phrase had undergone years of judicial construction before insurers used it in property-damage policies and that "[c]ourts had uniformly interpreted [it] to mean that the damage had to be unexpected and unintended for the insurance to apply, so that the phrase provided coverage for gradual events." *Alabama Plating Co.*, 690 So.2d at 336. The court defended its historical reasoning by noting that the "judicial construction placed upon particular words or phrases made prior to the issuance of a policy employing them will be presumed to have been the construction intended to be adopted by the parties." *See id.* (quoting *Couch on Insurance 2d* § 15:20 (1984)).

The Washington Supreme Court has perhaps best articulated the rationale for according the word "sudden" the meaning of unexpected rather than temporally abrupt in the context of insurance-liability policies. *See Anderson & Middleton Lumber Co. v. Lumbermen's Mutual Casualty Co.*, 53 Wash.2d 404, 333 P.2d 938 (1959). The *Anderson* court explained that "the risk to the insurer would be the same, whether a break was instantaneous or began with a crack which developed over a period of time until the final cleavage occurred, as long as its progress was undetectable." *Id.* at 940. It reasoned that construing "sudden" as unforeseen effectuated the purpose of the liability policy at issue, and, impliedly, insurance contracts in general: namely, to protect the policyholder in case of accidental occurrences, but to prevent the insured from "proceed[ing] recklessly and hold[ing] the insurer liable for damage if [the policyholder] had been forewarned * * * and could have taken steps to forestall it * * *." *Id.* at 940–41.

In *Hudson v. Farm Family Mutual Insurance Co.*, 142 N.H. 144, 697 A.2d 501, 502–03 (1997), the insured was a farmer who made a claim against his insurer for injury to his cows caused by stray voltage. The farmer asserted that his insurance contract covered losses involving "Sudden and Accidental Damage from * * * Electrical Current." *See id.* The insurer countered that the long-term exposure at issue was not "sudden and accidental." *Id.* at 503. The court held that, in this context, the word "sudden" meant unexpected. *See id.* at 504. In support of this holding, it cited a leading insurance manual to the effect that " 'sudden' is not to be construed as synonymous with instantaneous." *See id.* The *Hudson* court also noted that construing "sudden" to mean "unexpected" as in the above cases did not, as INA argues, create a redundancy with respect to the succeeding word accidental. *See id.* Rather, "the joint use of the words 'sudden and accidental' serves distinct purposes not accomplished by either word standing alone." *Id.* "Simply put, sudden means unexpected, and accidental means unintended." *Id.* (quoting *New Castle County v. Hartford Acc. and Indem. Co.*, 933 F.2d 1162, 1194 (3d Cir.1991)).

Based upon the above authorities, we conclude that INA's proposed reading of the word "sudden" as necessarily including a temporal element breaks with the history of the word as courts have construed it in other standard insurance policies. Our examination of the pollution-exclusion clause's drafting history similarly suggests that its original purpose—at least as the industry represented it to regulators—was to deny coverage to reckless or intentional polluters. We note first that the President of INA himself announced his company's intention to adopt the pollution-exclusion clause with these comments:

"INA will continue to cover pollution which results from an accidental discharge of effluents—the sort of thing that can occur when equipment breaks down. We will no longer insure the

company which knowingly dumps its wastes. In our opinion, such repeated actions—especially in violation of specific laws—are not insurable exposures. * * * We at INA hope that our anti-pollution exclusion may help encourage many companies to take the first, crucial steps toward improving their manufacturing processes— the steps that will lead eventually to a cleaner, healthier and, we hope, happier life for all." *Morton,* 629 A.2d at 850 (quoting Charles K. Cox, *Liability Insurance in an Era of the Consumer,* Address Before the Annual Conference of the American Society of Insurance Management, (Apr. 9, 1970), quoted in Robert S. Soderstrom, *The Role of Insurance in Environmental Litigation,* 11 *Forum* 762, 767 (1976)).

The Insurance Rating Board represents the insurance industry before state regulators. When seeking approval from the Rhode Island Department of Business Regulation (Insurance Division) for the policy language at issue, it submitted a circular containing an explanatory memorandum that read in part:

"Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The above exclusion clarifies this situation so as to avoid any question of intent. *Coverage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident * * *.*" (Emphasis added.)

Moreover, the above representations are consistent with those the insurance industry made to other states when seeking approval of the pollution-exclusion clause. For example, the secretary of Travelers Insurance Company's Product Management Division, in a letter to New York State's associate insurance examiner dated January 13, 1982, assured that state's Insurance Division that "there is nothing in the term 'sudden and accidental' which *requires* the elimination of gradually occurring events from the collective. A number of court decisions in many jurisdictions have essentially reached the same conclusion: there is nothing which prevents gradually occurring events from being construed to be 'sudden and accidental' as long as there is no intent to cause injury or damages."

As these cases suggest, state regulators as a practical matter often are the only parties who are in a position to negotiate language changes in proposed commercial insurance contracts. Under these circumstances, it is reasonable to hold insurers to the representations they made to regulators when seeking approval for a pollution-exclusion clause like this one, which is susceptible to more than one plausible interpretation.

Many of the cases INA cites in support of its position deal with manufacturers who entrusted the disposal of their waste to third-party waste haulers. *See, e.g., Stamford Wallpaper Co. v. TIG Insurance,* 138 F.3d 75, 80 (2nd Cir.1998) (holding that the mere fact that the manufacturer had handed its waste over to a third party did not automatically cause the release of waste to fall within the "sudden and accidental" exception to the pollution exclusion); *St. Paul Fire and Marine Insurance Co. v. Warwick Dyeing Corp.,* 26 F.3d 1195, 1204 (1st Cir.1994) (holding that a manufacturer's use of a waste disposal company did not allow it to obtain coverage under the exception to the pollution-exclusion clause because the discharge that caused the damage was the hauler's deposit of the waste in the landfill, not an intervening, unexpected event such as a sudden leak). And one of these cases employs the same standard for determining whether coverage applies in cases of third-party waste disposal that we have enunciated above. *See A. Johnson & Co. v. Aetna Casualty and Surety Co.,* 933 F.2d 66 (1st Cir.1991).

In *A. Johnson*, the plaintiff's predecessor had "arranged for the handling or transport of a pollutant which arrived at the Site and which has been discharged to ground water or other waters of the State." *Id.* at 67. Even though the First Circuit predicted that the Maine Supreme Judicial Court would construe the word "sudden" as having a temporal meaning, it held that the exclusion applied because "leakage from multiple storage tanks" at the disposal site constituted " 'common place events which occurred in the course of daily business' " and thus did not fall under the heading of sudden and accidental. *Id.* at 75–76 (quoting *Industrial Indemnity Insurance Co. v. Crown Auto Dealerships*, 731 F.Supp. 1517, 1520–21 (M.D.Fla.1990)). Whether the leaks in *A. Johnson* were temporally sudden was irrelevant; rather, their visible occurrence as part of the manufacturer's daily operations precluded their classification as sudden and accidental. Because the discharges were obvious and ongoing, the plaintiff-manufacturer could not have claimed they were unexpected. *See id.* at 75.

Similarly, in *Northern Insurance Co. of New York v. Aardvark Associates, Inc.*, 942 F.2d 189, 195 (3d Cir.1991), also cited by INA, the Third Circuit predicted that the Supreme Court of Pennsylvania would find a transporter of waste could not invoke the "sudden and accidental" exemption because the leakage had been occurring for some time and that "inspectors had 'noted approximately 1200 industrial waste drums in various stages of deterioration' and that * * * 'hazardous drum contents were leaking onto the soil * * *.' " A reading of "sudden" as meaning unexpected or unintended would not have changed the outcome of this case: again, the court used the clause to deny coverage to a knowing or reckless polluter whose contamination arose directly from its regular course-of-business activity without the aid of an intervening, unexpected event. *Id.* at 196.

Whether Textron's deposition of waste into the neutralization pond amounted to indiscriminate dumping of toxic chemicals conducted as part of its regular business activity, as in the above cases, or whether its regular practice was to contain the waste, neutralize it, and thereby try to prevent it from contaminating the environment, is a disputed question of material fact in this case. Unlike the manufacturer in *Warwick Dyeing*, Textron does allege—and may be able to prove at trial—that an intervening, unexpected event (namely, the unexpected leakage from the pond) caused the damage. *Cf. Warwick Dyeing*, 26 F.3d at 1204 (finding "no evidence of any intervening discharge between the disposal of waste on the landfill and the actual damage that eventually resulted"). Even though a separate line of cases refuses to absolve manufacturers from liability for toxic-waste cleanup costs simply because they turned the waste over to a third party whose actions caused environmental damage, this is not Textron's situation. Textron contends that its initial discharge into the pond did not cause the harm, but instead an intervening event, namely an unexpected leak, did so. The *Warwick Dyeing* court, as noted above, suggested that such an assertion would raise questions about the manufacturer's culpability for the leak. Thus, fact-finding is in order concerning whether these discharges were in fact unexpected and unintended, as Textron has alleged.

Construing the word "sudden" as meaning unexpected in pollution-exclusion clauses also represents sound public policy. Read this way, the clause rewards manufacturers with coverage if they undertake a good-faith effort to dispose of contaminants safely yet suffer an unexpected discharge despite these efforts, thus providing them with an incentive to arrange for the disposal of toxic waste with great care. In the case of manufacturers who independently contract for their waste disposal, this holding requires them to take reasonable steps to ascertain whether their hauler or carter complies with the highest

standards for waste disposal. A contrary interpretation of the clause would fail to distinguish between intentional and unintentional discharges, between waste dumped onto or into the ground in the middle of the night, and waste that has been carefully sealed in lined, state-of-the-art containers but nonetheless accidentally escapes into the environment. As a matter of interpreting this ambiguous clause, it seems prudent to follow a path that affords companies that use toxins in their work the incentive to handle them carefully, but that still affords coverage for truly unexpected and unintended releases of toxic materials.

## III

### Concurrent Causation

Textron next argues that the so-called "concurrent causation doctrine" also should have precluded summary judgment because a genuine issue of material fact exists concerning whether INA can prove that the sole cause of the damage at issue fell within the pollution-exclusion clause. INA counters that Textron's operations at this site were simply "pollution-prone" and that the motion justice correctly refused to "microanalyze the facts."

Although no Rhode Island case addresses this issue, the First Circuit has held that a jury should determine which event among several alternate possibilities "primarily caused" alleged environmental damage. *See CPC International, Inc. v. Northbrook Excess and Surplus Insurance Co.*, 144 F.3d 35, 48 (1st Cir.1998). In cases involving multiple discharges of pollutants, other courts have held that if property damage results from at least one covered cause, the fact that other non-covered causes also contributed to the property damage does not eliminate coverage. *E.g., SCSC Corp. v. Allied Mutual Insurance Co.*, 536 N.W.2d 305, 314 (Minn. 1995). In *SCSC*, the insurers of a business that allegedly contaminated groundwater beneath its property argued that they did not have to provide coverage. *See id.* at 309. They relied upon the same pollution-exclusion clause that is at issue in this case. *See id.* at 313. The jury found that multiple events caused the damage, yet it was unable to find that a covered event was the overriding cause. *See id.* at 314. In affirming the trial court's findings of liability on the part of the insurer, the Minnesota Supreme Court held that

> "Coverage is not defeated simply because a separate excluded cause contributes to the damages. * * * If the insurer asserts that a noncovered or excluded cause was the true cause, the insurer cannot simply show that this noncovered or excluded cause is a direct cause; it must show something more than that. It is consistent, therefore, to require the insurer to show that the noncovered or excluded cause is the overriding cause—so much so that it overrides the insured's showing of a direct, covered cause. To allow any less of a showing would conflict with the principle that the insured need show only one direct, covered cause." *Id.*

Similarly, in *Continental Casualty Co. v. Rapid–American Corp.*, 80 N.Y.2d 640, 593 N.Y.S.2d 966, 609 N.E.2d 506, 508 (1993), New York's highest court found that the insurer of a company that used asbestos was liable to defend against suits arising out of asbestos exposure even though the policy precluded coverage for any discharges into the atmosphere. The court held that even though some contamination may have occurred from ingestion through discharges into the air, some of it may also have occurred through direct contact with hands or clothing. See id. 593 N.Y.S.2d 966, 609 N.E.2d at 513. Hence, "[w]here contamination could occur in a variety of ways, only one of which is potentially excluded, [the insurer] cannot meet the heavy burden of showing that the exclusion applies * * *." *Id.*

Moreover, when, as here, an insured has offered "specific evidence creating a genu-

ine issue as to whether the incidents at the sites were sudden and accidental and caused more than a de minimis release of pollutants into the environment," summary judgment is inappropriate. *Millipore Corp. v. Travelers Indemnity Co.*, 115 F.3d 21, 34 (1st Cir.1997). (Emphasis added.) Similarly, the Massachusetts Supreme Judicial Court has held that a grant of summary judgment in favor of an insurance company on the basis of the pollution-exclusion clause was error when, notwithstanding the fact that "most of the releases resulted from * * * routine business practices, * * * some of the releases were indeed 'sudden and accidental.'" *Nashua Corp. v. First State Insurance Co.*, 420 Mass. 196, 648 N.E.2d 1272, 1276 (1995).

The reasoning in the above-cited cases persuades us that summary judgment was inappropriate here. Textron offered evidence of discharges other than those from the containment pond that could have been responsible for at least some of the environmental damage at issue. For example, the intermittent releases of steam from the rocket-cell testing waters and the accidental leaks of chemicals from the rocket-cell testing area and from the blade-bonding facility could have caused at least some of the damage in question. This evidence requires fact-finding on the part of the jury to apportion the damages between covered and noncovered damages or to determine that no such apportionment is possible.

### Conclusion

In sum, then, we hold that the Superior Court erred in granting summary judgment because genuine issues of material fact exist that require resolution by the fact-finder. For these reasons we sustain Textron's appeal, vacate the Superior Court's judgment, and remand this case for further proceedings consistent with this opinion.