389 A.2d 1246.

ANTHONY IADEVAIA *v.* AETNA BRIDGE COMPANY.

AUGUST 3, 1978.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger,  JJ.

KELLEHER, J.   This is a negligence action in which the defendant, Aetna Bridge Company (Aetna), is before us on its appeal from a $60,000 judgment entered after a Superior court jury returned a verdict in favor of the plaintiff, Anthony Iadevaia (Anthony). In his complaint Anthony alleged that he had received permanent disabling injuries because Aetna had attached defective equipment to a back-hoe which was owned by Anthony's employer, Amco Trenching, Inc. (Amco). In its appeal Aetna claims that the trial justice erred in denying its motion for a directed verdict and its motion for a new trial.

Since the crucial issue in this controversy relates to the motion for a directed verdict, we are required, as was the trial justice, to view the evidence and the inferences flowing therefrom in the light most favorable to Anthony without giving any consideration to the evidence's weight and the credibility of the witnesses. *Evans* v. *Liguori*, 118 R.I. 389,

374 A.2d 774 (1977); *Goodbody & Co.* v. *Parente,* 116 R.I. 437, 358 A.2d 32 (1976); *Lombardi* v. *Dryden Corp.,* 114 R.I. 202, 330 A.2d 416 (1975).

So viewing the record, it appears that sometime near the beginning of 1970 Aetna was about to embark upon a project which called for the demolition of the concrete roadway on the "old" Washington Bridge and the installation of a new road. At that time, the old bridge, which still spans the Seekonk River, served as a link between the cities of Providence and East Providence.[1] In March 1970 Aetna entered into a contract with Amco, a corporation whose physical assets and personnel consisted of a backhoe, a truck, a trailer, and one employee. Amco agreed to supply Aetna with a backhoe and an operator. Amco's sole employee and hoe operator was Anthony. Anthony told the jury that he and his wife "owned' Amco. His salary while he worked on the bridge was paid by Amco.

Once Amco's hoe and its operator arrived on the project site, Aetna's employees immediately modified the hoe by removing its trenching bucket and mounting a steel pneumatic hammer near the end of the hoe's boom. The hammer measured about 4 feet in length, a foot in width, and weighed between 1,000 and 1,500 pounds. When the hammer was about to become operational, a 100-pound steel chisel was inserted into its open end. The hammer was then connected by a hose to an air compressor that could generate pressure of 100 pounds per square inch.

Just prior to the beginning of a day's demolition, Anthony would mount the hoe's frame, take a seat in front of the con-

---

[1] Today the Washington Bridge consists of two spans, a north span and a south span. The south span or old bridge was dedicated in September 1930. The north span, which lies 30 feet north of the south span, was dedicated in December 1968. Thereafter, in 1970 the state embarked upon its renovation project for the old bridge. The restored structure was opened to traffic in the fall of 1971. Both spans are now part of Interstate Route 195. The old or south bridge is reserved for eastbound traffic, while the north or new bridge serves the westbound motorist. Providence Journal-Bulletin Rhode Island Almanac 55 (1977 ed.).

trol panel, and manipulate a series of levers. Anthony's manipulations would cause the boom to lower to a point where the chisel rested on the concrete. Anthony would then move a lever and apply "down pressure" so that the pressure would cause the chisel to recede into the hammer's chamber about 2 inches. The recession, in turn, would open the hammer's air valve. The compressed air would rush into the chamber, and the hammer would strike the chisel's head with great force and rapidity, driving the chisel's point into the concrete. In time the hammer and its attached chisel broke the roadbed into a number of chunks, each of which weighed between 10 and 15 tons. Cranes would move in and remove the chunks. Once Anthony arrived on the bridge in late March and began work on or about April 1, 1970, he stayed on the job until the last Friday in August. During this 5-month period Anthony and the hoe worked a 5-day week and an 8-hour day as they made big chunks of the bridge's roadway.

During this 5-month period three different hammers were attached to the boom. The first hammer was a "Kent" and was used for about 2 weeks. The Kent produced a smooth rhythm and broke the cement "beautifully." However, the Kent had a tendency to break the chisels in half. This deficiency called for the installation of another hammer. The second hammer was a "Worthington." It was affixed to the boom, and the Worthington worked just as smoothly as the Kent until the middle of August, when, according to Anthony, the hammer began to "wear out." As the hammer began to wear, it lost its smooth rhythm, and as it did, the hoe and its operator began to get jolted and shaken. The malfunctioning hammer was giving Anthony an "awful bang."

The banging went on for almost a week. When Anthony complained to the project superintendent, he was told to "be patient" because the third hammer was due in any day from the repair shop. The third hammer did appear on the Friday before the 1970 Labor Day weekend was about to begin.

After the hammer was placed into position, Anthony, with his back aching, took his seat before the control panel and lowered the boom. When he applied pressure, the chisel receded, but, alas and alack, the hammer did not "fire."

At this point a foreman told Anthony to raise the boom up in the air and let it drop on the roadway. The foreman explained that the hammer was "tight" and the "drop" would activate the unit. Anthony employed the drop approach seven or eight times, and each time, as the point pounded into the cement, the hoe and its operator were shaken. After the last try, Anthony told the foreman that he was done for the day because the "shaking up * * * was too much for my back."

On the following Tuesday, Anthony reported to the superintendent and told his supervisor that, because of the back pain, he would be unable to continue on the job. The superintendent referred Anthony to an orthopedic surgeon, and in time Anthony sought the advice of his own surgeon. Later, in May 1971, Anthony underwent surgery, which resulted in the removal of a ruptured disc located in his lower back. Both surgeons testified that Anthony's aching back and ruptured disc were directly related to the shaking up he experienced in late August 1970. They also agreed that Anthony was totally disabled.

The modification of the backhoe by the addition of the demolition hammer was a new experience for Anthony. While he had operated a backhoe for several years, the Washington Bridge project was the first time Anthony had operated a modified hoe which was designed for the specific purpose of breaking up cement. The superintendent termed use of the hammers as an "experiment." The foreman conceded that initially the Worthington "worked like a charm" as it broke up the cement. He admitted that when Anthony complained to him about the Worthington's wearing out, he told the hoe operator that until such time as the third hammer showed up, Anthony was expected to stick

with the second hammer because the cranes were due in to remove the chunks, and the remaining roadway had to be demolished.

Aetna's motion for a directed verdict was premised on its contention that Anthony's claim was barred by the doctrines of assumption of the risk and contributory negligence. In addressing ourselves to this facet of Aetna's appeal, we would once again stress that, so far as this jurisdiction is concerned, there is no overlap between the doctrines of assumption of the risk and contributory negligence. The doctrines differ significantly in that when a defendant charges a plaintiff with assuming a risk, a subjective standard is employed as a determination is made regarding what the particular plaintiff in fact saw, knew, understood, and appreciated, while, in assessing a plaintiff's freedom from contributory negligence, an objective criterion is applied, as our concern is how, in the particular incident, the hypothetical reasonable man would have acted. *Kennedy* v. *Providence Hockey Club, Inc.,* 119 R.I. 70, 376 A.2d 329 (1977); *D'Andrea* v. *Sears, Roebuck and Co.,* 109 R.I. 479, 287 A.2d 629 (1972). Assumption of the risk is an affirmative defense, which must be pleaded and proved by the defendant, Super R. Civ. P. 8(c), while the plaintiff in a negligence case has the burden of proving that he was in the exercise of due care. *Silvia* v. *Caizzi,* 63 R.I. 172, 7 A.2d 704 (1939).[2] As a general rule, issues involving assumption of the risk and contributory negligence present factual questions for a jury to decide unless the evidence is conclusive. However, if such a unique occasion arises in which the facts can suggest only one reasonable inference, the trial justice must treat the issue as one of law. *Kennedy* v. *Providence Hockey Club, Inc.,* 119 R.I. 70,

---

[2]In 1971 the Legislature abolished the doctrine of contributory negligence by its enactment of a comparative negligence statute. P.L. 1971, ch. 206 [now G.L. 1956 (1969 Reenactment) §9-20-4, as amended]. The statute became effective in July 1971 and by its terms is applicable to "all actions hereafter brought * * *." This litigation began in August 1972, but the litigants have seen fit to treat this suit as not coming within the ambit of the statute.

376 A.2d 329 (1977); *Garris* v. *Gloss*, 111 R.I. 453, 303 A.2d 765 (1973).

To warrant a directed verdict when the motion is based upon the assumption of the risk doctrine, the record must admit of only one reasonable inference: namely, that Anthony voluntarily consented to running a risk after he actually knew and understood the magnitude of the risk he incurred. The specific risk in this case is the risk of a serious back injury. Put another way, the defense must prove that the plaintiff actually knew about the risk involved and appreciated its magnitude, for, as Prosser said:

> " 'Knowledge of the risk is the watchword of assumption of risk.' Under ordinary circumstances the plaintiff will not be taken to assume any risk of either activities or conditions of which he is ignorant. Furthermore, he must not only know of the facts which create the danger, but he must comprehend and appreciate the danger itself." Prosser, *Torts,* §68 at 447 (4th ed. 1971) (footnotes omitted.)

To hold that Anthony assumed the risk of a serious back injury, the record would have to indicate that (1) Aetna produced evidence which demonstrated that Anthony, by remaining at the controls during the last days of August 1970, had agreed to take a chance and risk such an injury, and that (2) there was no evidence which would rebut this suggestion.

In concerning ourselves solely with the area of Anthony's actual knowledge of the risk and his appreciation of its magnitude, we note that Aetna relies upon evidence which indicates that Anthony had been operating a backhoe for about 30 years. The bridge contractor directs our attention to a portion of Anthony's cross-examination where he admitted that during the wearing-out process of the second hammer, he kept his hoe in operation even though his back was hurting "minute after minute" and "hour after hour." His superintendent told the jury that when Anthony first arrived on the job, he stated that he was not sure about how long he

could operate the hoe because of his bad back. The foreman also informed the jury that there were several times when Anthony complained to him about his back. On the other hand, while Anthony admitted his long-time association with the construction industry, he emphasized that the Washington Bridge project was the first time he had ever worked with a half-ton pneumatic hammer attached to the hoe's boom. He also insisted that the only time he ever referred to his bad back was during the last days on the job, when the Worthinton was no longer "work[ing] like a charm." According to Aetna, the record presents a "clear case of assumption of the risk" by "an experienced backhoe operator" who realized that every time he operated the hoe "his back was being hurt" but "gambled" the he could finish the job "without seriously injuring his back."

We cannot agree with such a hypothesis. It seems to us that following any amount of unusual physical exertion one can expect to experience a certain amount of pain, be he a weekend gardener or a full-time backhoe operator. The mere fact that Anthony, at some point near the completion of his efforts to break up the roadway, experienced a continuous on-the-job-type of pain does not warrant an immutable belief that Anthony had decided to take the chance and risk something akin to a ruptured disc. A worker's complaint about his back, as well as his willingness to report for work and do his job, does not give rise to an irrebuttable presumption that the worker must have known that he was running a risk of injury and decided to make that run. Aetna obviously does not appreciate the great resiliency of the human body or the soothing effect of such commodities as sleep, liniment, or heat. Many an individual will tolerate pain with the hope that in time the pain will work itself out and disappear. Here the evidence in no way indisputably demonstrates that Anthony had knowingly crossed beyond the threshold of tolerable pain and was prepared to chance serious injury. We cannot conclude that Aetna has adduced evidence which conclusively established its defense of assumption of the risk.

The issue of Anthony's due care for his own safety was one that was quite properly referred to the jury for its consideration. There was no question that when Anthony complained to Aetna's supervisory personnel about the second hammer's wearing out, they told him to be patient — a replacement was on its way. When the third hammer would not fire, he was ordered to drop the boom. The foreman conceded that there was a work schedule that had to be kept. The hoe had to be kept busy so that the cranes could get on with the job of removing the chunks. If Anthony did not cooperate, Amco's hoe and its operator would obviously be replaced. All of these factors were proper grist for the mill as the jury considered whether or not Anthony acted as a reasonable person when, despite his back pain, he kept showing up for work and tryng to obey orders.

There is no need to embark upon a lengthy discussion of the denial of the new trial motion. The record presented pure questions of fact. While Aetna sought to portray Anthony as an individual who, fully aware of the impending peril, arrived on the job with a chronic bad back which remained in that condition for a period of 5 months, Anthony denied that this was so. In rejecting the new trial motion, the trial justice specifically said that he believed Anthony and characterized the controversy as one in which reasonable men could differ as to the conclusion to be reached. Aetna has failed to convince us that in his consideration of the new trial motion the trial justice either misconceived or overlooked material evidence on a controlling point or was otherwise clearly wrong.

Even if we were to assume that the trial justice's consideration of the new trial motion was inadequate, we would then apply the appellate rule to see whether the evidence strongly preponderated against the jury's verdict. Since credibility is beyond our ken, we examine the record in the light most favorable to the prevailing party to see if there is any competent evidence which supports the jury's verdict. *Morinville* v. *Morinville,* 116 R.I. 507, 359 A.2d 48 (1976). When we

apply this standard to the record before us, it is obvious that there is competent evidence supporting the jury's verdict.

The defendant's appeal is denied and dismissed.

*Lovett & Linder, Ltd., Stephen G. Linder, Sumner David Stone,* of counsel, for plaintiff.

*Hanson, Curran, Bowen & Parks, A. Lauriston Parks, David P. Whitman,* for defendant.