Louise DREW

v.

James WALL.

83–120–Appeal.

Supreme Court of Rhode Island.

June 27, 1985.

Kenneth M. Beaver, Milton Bernstein, Providence, for plaintiff.

Raymond A. LaFazia/Thomas Chester (Gunning LaFazia & Gnys, Inc.), Providence, for defendant.

## OPINION

BEVILACQUA, Chief Justice.

This is a civil action brought by the plaintiff, the mother of the decedent, Jon Drew, to recover damages for the wrongful death of her son due to the negligence of the defendant, James Wall. The case was tried before a justice of the Superior Court and a jury. The case comes before us on the plaintiff's appeal from the Superior Court judgment granting the defendant's motion for a directed verdict.

On February 18, 1976, decedent was employed as an assistant superintendent of maintenance at Harborside Park, an affiliate of P & M Enterprises, Inc., and was one of four men under the supervision of defendant. The decedent's main duties included maintaining the pumps and boilers that serviced the facilities of the shipyard's dozen tenants. These pumps in the sewer pits pumped sewerage from two or three buildings from the sewerage level of the premises to the city sewer level. On February 17, 1976, the day preceding his death, decedent learned that the electrical pumps in one sewage area had malfunctioned and water was accumulating in the pit. The defendant told decedent that the water should be pumped out, instructing him to get the necessary equipment to accomplish this task. This equipment included a pump with a hard-hose end necessary for suctioning in water, and a soft hose from the pump used to then expel the water.

The defendant further testified that he told decedent to place the gasoline-powered pump outside the pit, as decedent had done when he had performed the same job seven or eight months earlier. The decedent and fellow worker Richard King were then in-

structed not to go into the pit. On the afternoon of February 17, 1976, defendant visited the work site and found that decedent had violated his orders by placing the pump inside the pit. A heated discussion ensued, during which defendant ordered decedent to stay out of the pit and to let the pump keep running until it ran out of gas.

The plaintiff testified that her son came home tired and upset on the evening of February 17, complaining that the employers were cheap. He told her that since there had been insufficient hard hose to place the pump outside the pit, he had placed it in the pit in an effort to get the job done quickly. The defendant countered this testimony, stating that there was no emergency at that time requiring decedent to take such a drastic measure.

At approximately 8:30 a.m. on February 18, 1976, defendant visited the work area and found decedent and a coworker, Norbert F. Medeiros, examining the electrical pump system. At that time the pump was still in the pit but was not running. When defendant left, both workers then decided to turn on the gasoline pump while they were checking the fuses to the electrical pump in another building. When they returned, decedent went into the pit, shut the motor off, and then came out and waited with Medeiros for about forty-five minutes until the fumes dispersed. They then climbed back into the pit to repair the electrical pumps but soon became dizzy. Medeiros suggested they leave, but before they did, decedent turned the gasoline pump on again. When defendant went by the site at approximately 9:45 a.m., he saw Medeiros and decedent in the pit, lying in front of the ladder on the floor. The decedent died of carbon monoxide poisoning.

The plaintiff brought suit against defendant for the alleged wrongful death of her son, alleging that the negligence of defendant had caused her son's death. The defendant affirmatively plead the defense of assumption of the risk. At the close of plaintiff's case, defendant made a motion for a directed verdict. The trial justice granted the motion, finding that plaintiff had failed to establish a prima facie case of negligence on the part of defendant and that, as a matter of law, decedent had assumed the risk that caused his death.

In reviewing a motion for a directed verdict, we have the obligation to view the evidence in the light most favorable to the party against whom the motion has been made. We must not consider the credibility of the witnesses or the weight of the evidence. Where issues exist upon which reasonable minds may differ, the jury is entitled to decide the facts of the case. *Bitgood v. Allstate Insurance Co.,* —— R.I. ——, ——, 481 A.2d 1001, 1005 (1984); *Marcotte v. Harrison,* —— R.I. ——, ——, 443 A.2d 1225, 1229 (1982).

We need not address the issue of defendant's negligence because we find that decedent assumed the risk that caused his death. The doctrine of assumption of the risk is an affirmative defense that may be invoked to defeat the liability of the employer, even if the negligence of the employer has already been established. *Dawes v. McKenna,* 100 R.I. 317, 322, 215 A.2d 235, 238 (1965). Generally, the issue of whether a plaintiff assumed a risk is for a trier of fact to decide. If the facts suggest only one reasonable inference, however, the issue becomes a question of law and consequently may be decided by the trial justice. *Rickey v. Boden,* —— R.I. ——, ——, 421 A.2d 539, 543 (1980); *Iadevaia v. Aetna Bridge Co.,* 120 R.I. 610, 615, 389 A.2d 1246, 1249 (1978).

To prove this doctrine, defendant must establish that plaintiff knew of the existence of a danger, appreciated its unreasonable character, and then voluntarily exposed himself to it. *Rickey v. Boden,* —— R.I. at ——, 421 A.2d at 543. The standard for determining whether a plaintiff voluntarily encountered a risk is subjective; therefore, we must look to the record to ascertain what this particular individual in fact saw, knew, understood, and

appreciated. *Kennedy v. Providence Hockey Club, Inc.*, 119 R.I. 70, 75, 376 A.2d 329, 332 (1977); *D'Andrea v. Sears, Roebuck and Co.*, 109 R.I. 479, 487, 287 A.2d 629, 633 (1972).

■ The defendant, Wall, has presented evidence that establishes that decedent did in fact appreciate the danger of asphyxiation from operating an internal combustion motor in an enclosed area. The record first reveals that decedent was familiar with the operations of the shipyard since he had worked there for about four years before his death. He had a reputation for working diligently and for trying to learn as much as he could about his job. On February 18, 1976, his main duties included maintaining the pumps and boilers that serviced the facilities of the shipyard's dozen tenants. In fact, the evidence presented demonstrates that decedent was actually familiar with pumping water out of the sewer pit since he had performed the same task seven or eight months earlier.

Even if decedent had been unaware before February 17, 1976, that running the engine in an enclosed area was dangerous, we can reasonably infer that he learned of this risk from defendant's conduct. Both parties stipulate that defendant specifically instructed decedent to place the pump outside the pit and to then get the equipment necessary for getting the job done. Both parties also agree that when defendant learned that the pump had been placed in the pit, he ordered that it be left to run until it ran out of gas. Taking this evidence in the light most favorable to decedent, we feel confident that we must necessarily infer that a man with Drew's background and experience in the shipyard knew of the hazard of entering the pit with the engine operating.

The decedent's own conduct substantiates this inference. Norbert F. Medeiros, the decedent's coworker on February 18, testified that they first turned the pump on that day when they would be away in another building checking fuses. Upon their return, decedent climbed into the pit to shut the engine off but immediately came back up. They then waited approximately forty-five minutes before reentering because they knew that the fumes were dangerous.

The plaintiff contends that this period of waiting for forty-five minutes until the fumes subsided negates the determination that they had voluntarily assumed a risk. What plaintiff fails to point out, however, is that after the workers were in the pit for a while, they began to feel dizzy and consequently decided to climb out. Before they left, decedent restarted the engine. Seconds later, he was lying by the ladder, unable to climb out.

We find that this voluntary action of restarting the engine, after he was already feeling dizzy, clearly establishes that he assumed the risk. We have consistently held that a plaintiff who has voluntarily elected one of a number of alternatives "will be held to have assumed the risks attending the choice of such alternative if the other conditions of the assumption-of-risk doctrine are present." *Rickey v. Boden*, —— R.I. at ——, 421 A.2d at 544; *see Pacific Portland Cement Co. v. Bellamy*, 187 F.2d 701, 703 (9th Cir.1951). In *Rickey* a woman chose to climb up a dangerous stairway, which had narrow treads and no handrail, in order to go to a coffee room on the next floor. The court determined that the woman was under no compulsion to use that particular coffee room during her break and had several options reasonably available to her. Because the woman could have avoided using the stairway, the court held that she had voluntarily assumed the risk that caused her injury. *Rickey v. Boden*, —— R.I. at ——, 421 A.2d at 544.

Similarly, the decedent was under no compulsion to restart the engine, especially when he was already feeling dizzy from the fumes. He knew of the danger and still voluntarily encountered it. In light of this evidence, we hold that the trial justice's granting of the defendant's motion for a directed verdict on the basis of the doctrine of assumption of the risk was proper.

The plaintiff's appeal is denied and dismissed, the judgment appealed from is sustained, and the case is remanded to the Superior Court.

WEISBERGER and SHEA, JJ., did not participate.