# United States Court of Appeals
## For the First Circuit

No. 11-2193

TRAVELERS CASUALTY AND SURETY COMPANY,

Plaintiff, Appellant,

v.

PROVIDENCE WASHINGTON INSURANCE COMPANY, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Howard, Lipez and Thompson,
Circuit Judges.

Robert A. Kole, with whom John A. Nadas, Nellie E. Staley, Choate, Hall & Stewart LLP, Jason C. Preciphs, R. Kelly Sheridan and Roberts, Carroll, Feldstein & Peirce, were on brief for appellant.
Todd D. White, with whom Katy A. Hynes, John T. Mulcahy and Adler Pollock & Sheehan P.C. were on brief, for appellee.

July 11, 2012

**HOWARD, <u>Circuit Judge</u>.** Invoking diversity jurisdiction, appellant Travelers Casualty and Surety Company, Inc. ("Travelers") sought a declaratory judgment that appellee Providence Washington Insurance Company, Inc. ("PWIC") is obliged to join in the defense of New England Container Company, Inc. ("NE Container" or "NECC"), in connection with a contribution action involving clean-up costs for the Rhode Island Centredale Manor Superfund Site ("Superfund Site" or "Site"). Granting summary judgment to PWIC, the district court ruled that PWIC did not owe NE Container a duty to defend in the underlying action. On Travelers' appeal, we reverse the decision, vacate the judgment, and remand.

## I. Background

The dispute between the two insurance companies stems from efforts that the Environmental Protection Agency ("EPA") initiated over a decade ago to remediate environmental contamination at the Superfund Site under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). <u>See</u> 42 U.S.C. §§ 9601-9675. This case touches only the tip of the litigation iceberg regarding the Site.[1] To decide it, we broach Rhode Island law on the duty to defend in the environmental damage context, albeit under circumstances in which the Rhode Island

---

[1] <u>See, e.g.</u>, <u>Emhart Indus., Inc.</u> v. <u>Century Indem. Co.</u>, 559 F.3d 57 (1st Cir. 2009); <u>Century Indem. Co.</u> v. <u>Liberty Mut. Ins. Co.</u>, 815 F. Supp. 2d 508 (D.R.I. 2011); <u>Century Indem. Co.</u> v. <u>Liberty Mut. Ins. Co.</u>, 708 F. Supp. 2d 202 (D.R.I. 2010).

Supreme Court has had little opportunity to apply its own precedents.

The catalyst for this litigation occurred in 2000, when the EPA issued a unilateral administrative order to compel several entities, including NE Container and Emhart Industries, Inc. ("Emhart"), to remove hazardous substances that had been disposed of at the Site as part of the former operations of several companies. The agency noted that hazardous substances had been found in surface and subsurface soil, in sediment, and in the groundwater and surface water of the adjacent Woonasquatucket River. It described Emhart as a successor to the liability of several chemical companies that had operated at the Site from about 1943 to approximately 1971 and had buried drums and other containers at the Site. The EPA also stated that NE Container had conducted business operations at the Site from approximately 1952 to around 1969. Those operations included obtaining 55-gallon drums containing residual chemicals, disposing of drum residuals in the soil, and incinerating the residuals. Finally, the current owners of the Site property were identified as two limited partnerships that had acquired the property in 1976 and 1982, respectively, and had constructed two high-rise apartment buildings, a roadway and parking lots in the mid-1970s and the early 1980s.

Some years after the administrative order was issued, in 2006 Emhart filed federal and state court actions against NE Container and the two NE Container insurers that are the parties currently before us ("Emhart action" or "Emhart complaint").[2] Each action levied essentially the same general claims: that NE Container is liable for at least some of the response costs that Emhart has been paying, and would pay in the future, in connection with the clean-up of the Superfund Site; and that NE Container's insurers are obliged under their policies to provide coverage to NE Container for any monies that it owes Emhart in relation to the Site response costs.[3] The insurers had provided general commercial liability policies to NE Container during different time periods from the late 1960s through the mid-1980s. Travelers' policies extended from 1969 to 1982, and PWIC's policies spanned the years 1982 to 1985.

NE Container subsequently tendered the Emhart action to its insurers. Travelers agreed to contribute to NE Container's defense pursuant to a reservation of rights, while PWIC took the position that it had no duty to defend. Travelers has since

---

[2] In its brief, appellee PWIC remarks in passing that "[a] direct action against a third-party's insurer's [sic], when the third-party is neither deceased nor bankrupt, is unusual at best, and arguably prohibited by statute." It provides no developed argument on the matter, and we give it no further attention. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

[3] For ease, we henceforth refer to the complaints in the singular.

-4-

incurred significant defense costs associated with the Emhart action, bringing us to the matter that is the basis for this appeal.

In 2010, Travelers filed the instant action in federal court, seeking a judgment compelling PWIC to contribute to NE Container's defense in the Emhart action and an award for PWIC's fair share of the past defense costs that Travelers has incurred. The two insurance companies eventually filed cross-motions for summary judgment. The district court ruled that PWIC was not contractually obligated to defend NE Container in the Emhart action, observing that, "the alleged property damage occurred before the commencement of [the PWIC policy period between 1982 and 1985]." This timely appeal followed. As we explain, the district court mistakenly focused solely on the timing of the insured's alleged polluting activities, rather than also considering the potential timing of property damage caused by those activities.

## II. Analysis

This diversity case is governed by Rhode Island substantive law. Our review is de novo because the question of an insurer's duty to defend is one of law in Rhode Island. See Flori v. Allstate Ins. Co., 388 A.2d 25, 26 (R.I. 1978). Before delving into the particulars of the case we outline the legal landscape.

## A. Rhode Island Insurance Law

Generally speaking, an insurer's obligations toward its insured are two-fold: a duty to defend and a duty to indemnify. See, e.g., Mellow v. Med. Malpractice Joint Underwriting Ass'n of R.I., 567 A.2d 367, 368 (R.I. 1989) (per curiam). "[T]he duty to defend is broader in its scope than the duty of an insurer to indemnify, and its existence does not depend on whether the injured party will ultimately prevail against the insured." Employers' Fire Ins. Co. v. Beals, 240 A.2d 397, 403 (R.I. 1968), abrogated on other grounds by Peerless Ins. Co. v. Viegas, 667 A.2d 785 (R.I. 1995). Whether an insurer's duty to defend arises from the inception of a lawsuit against its policyholder hinges

> on whether the complaint in the underlying tort action alleges facts and circumstances bringing the case within the coverage afforded by the policy. That question is resolved by comparing the complaint in that action with the policy issued by the insurer; if the complaint discloses a statement of facts bringing the case potentially within the risk coverage of the policy the insurer will be duty-bound to defend irrespective of whether the plaintiffs in the tort action can or will ultimately prevail.

Flori, 388 A.2d at 26 (emphasis added); accord Hingham Mut. Fire Ins. Co. v. Heroux, 549 A.2d 265, 266 (R.I. 1988).

Rhode Island thus applies the common "pleadings test." See Progressive Cas. Ins. Co. v. Narragansett Auto Sales, 764 A.2d 722, 724 (R.I. 2001); see also Emhart Indus., 559 F.3d at 75

(reviewing Rhode Island law). As suggested by its name, the pleadings test focuses on the pleading allegations without consideration of extrinsic evidence; therefore, the duty to defend may arise even where "known facts conflict with the facts alleged in the . . . complaint." Flori, 388 A.2d at 26; see also Beals, 240 A.2d at 403 (concluding that "a liability insurer's duty to defend is predicated not upon information in its possession which indicates or even proves non-coverage, but instead upon the allegations in the complaint filed against the insured").

Once triggered, an insurer's duty to defend continues until the coverage question is resolved either by the establishment of facts showing no potential for coverage or by the conclusion of the underlying lawsuit. See Shelby Ins. Co. v. Ne. Structures, Inc., 767 A.2d 75, 77 (R.I. 2001); Conanicut Marine Serv., Inc. v. Ins. Co. of N. Am., 511 A.2d 967, 971 (R.I. 1986). An insurer may seize the initiative and seek resolution of coverage questions, including the duty to defend, in a declaratory judgment action. See Emhart Indus., 559 F.3d at 74 (construing Rhode Island law); Conanicut Marine, 511 A.2d at 971 & n.10; see also Beals, 240 A.2d at 401.

Against this legal backdrop, we set forth the pertinent policy language as informed by Rhode Island law. We then describe the Emhart complaint, and finally turn to assess the grant of summary judgment.

-7-

## B. Providence Washington Policies

The general grant of coverage and duty to defend provisions provide:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage . . . to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent.

(Emphasis added.) An "occurrence" is defined as "an accident, including continuous or repeated exposure to conditions which results in . . . property damage neither expected nor intended from the standpoint of the insured." (Emphasis added.) In turn, "property damage," is defined, in part, as "physical injury or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom . . . ." (Emphasis added.) With respect to property damage caused by pollution, the policies provide:

> This insurance does not apply . . . to . . . property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alikis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

(Emphasis added.)

Rhode Island case law provides a gloss on the meaning of the term "occurrence" as set forth in the PWIC policies -- particularly in the environmental pollution context. Especially germane here, the state supreme court has addressed "when there has been an 'occurrence' sufficient to trigger coverage under a general liability policy [where] the insured sustains a chemical spill that results in a property loss that is not discovered until years after the spill took place." CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co., 668 A.2d 647, 649 (R.I. 1995), clarification denied, 673 A.2d 71 (R.I. 1996). The court determined that the policy terms "property damage" and "occurrence" were "inextricably intertwined," and that coverage extended to

> an event that results in compensable property damage during the policy period. In other words, there can be no occurrence under the policy without property damage that becomes apparent during the policy period, and property loss and compensable damages cannot be assessed unless the property damage is discovered or manifests itself.

Id. at 649 (emphasis added). Ultimately, it held that "coverage under a general liability policy is triggered by an occurrence that takes place when property damage, which includes property loss, manifests itself or is discovered or in the exercise of reasonable diligence is discoverable." Id. at 650; see also Textron, Inc. v. Aetna Cas. and Sur. Co. ("Textron-Wheatfield"), 754 A.2d 742, 745 (R.I. 2000); Textron, Inc. v. Aetna Cas. and Sur. Co. ("Textron-

Gastonia"), 723 A.2d 1138, 1141 (R.I. 1999) (holding that each part of the CPC Int'l test "independently triggers liability coverage under an occurrence-based policy"); 4 Jeffrey E. Thomas et al., New Appleman on Insurance Law Library Edition § 27.01[7][f] (2010) (summarizing Rhode Island's approach for environmental property damage coverage triggers).

The parties agree that the only CPC Int'l trigger category that potentially is implicated in the present circumstances is that an occurrence takes place when the property damage "was discoverable in the exercise of reasonable diligence during the policy period, notwithstanding the fact that it was not actually discovered." Textron-Gastonia, 723 A.2d at 1143. For this trigger category to implicate coverage under an occurrence-based policy, the Rhode Island Supreme Court has explained that

> the contamination [must] not only exist during the period of coverage, but also be discoverable in the exercise of reasonable diligence. In other words, in order to trigger coverage in the absence of actual discovery, [the insured] must have had some reason to test for contamination, and must actually have been able to discover it in the exercise of reasonable diligence.

Id. at 1144 (citation omitted); see also Textron-Wheatfield, 754 A.2d at 745 (citing Textron-Gastonia in distilling the components required for the discoverable in the exercise of reasonable diligence coverage trigger). The obligation to exercise reasonable diligence calls upon a reviewing court to examine what the insured

-10-

"should have known," see CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co., 144 F.3d 35, 43 n.6 (1st Cir. 1998) (interpreting Rhode Island law); it does not, however, require the business operator "to go around looking to find out if [it is] contaminating anything," Textron-Wheatfield, 754 A.2d at 746 (internal quotation marks omitted).

Accordingly, in the context of the pleadings test, the Emhart complaint gives rise to PWIC's duty to defend NE Container if its allegations show the potential that property damage was discoverable in the exercise of reasonable diligence during the policy period, between 1982 and 1985.

**C. Allegations in the Emhart Complaint**

The complaint first sketches the EPA's charges against the multiple polluters of the Site, including the 1999 notice of potential liability issued to NE Container and the EPA's demand in 2000 that Emhart remediate the Site and reimburse the EPA for the response costs. The EPA also issued a unilateral administrative order to NE Container and Emhart, as well as to other entities, requiring them to undertake certain time-critical actions to remediate the environmental conditions at the Site. The complaint identifies the Site as two parcels of land and portions of the adjacent Woonasquatucket River and its floodplain. According to the complaint, the EPA still needed to complete a "Remedial

-11-

Investigation to characterize the nature and extent of the contamination at the Site . . . ."

The Emhart complaint also describes NE Container's alleged polluting activities at the Site.  It alleges that NE Container operated a facility for reconditioning steel drums on a portion of the Site from about 1952 until the early 1970s; that the drums "often contained small amounts of residue" including trichorophenol; and that during its business operations NE Container had "incinerated the drums that it received" and "spills and leaks of the residual contents of the drums" occurred when they were brought to the incinerator.  The complaint further states:

· [T]he actions of NECC in incinerating drums, as part of the reconditioning process, resulted in the "release" into the "environment," within the meaning of 42 U.S.C. §§ 9601(8) and 9601(22), of various cogeners of dioxin;

· In addition to the release of dioxin, the operations of NECC resulted in the "release" into the "environment," within the meaning of 42 U.S.C. §§ 9601(8) and 9601(22), of other "hazardous substances," within the meaning of 42 U.S.C. § 9601(14);

· [D]uring the period in which NECC was an operator of a portion of the Site, there was "disposal," within the meaning of 42 U.S.C. § 9601(29), of "hazardous substances," within the meaning of 42 U.S.C. § 9601(14), at the Site as a result of the activities of NECC;

· [A]s a result of activities conducted at the Site by NECC, there have been "releases" or threatened "releases," within the meaning of

-12-

42 U.S.C. §§ 9601(8) and 9601(22), of "hazardous substances," within the meaning of 42 U.S.C. § 9601(14), at and from the Site.

• The aforesaid releases or threatened releases of hazardous substances at the Site have caused Emhart to incur necessary "response" costs, within the meaning of 42 U.S.C. § 9601(25), . . . [for which] NECC is liable to Emhart for its proportional share . . . .

• [T]here is a controversy between Emhart and NECC concerning the nature and extent of the obligation of NECC to pay for anticipated future response costs with respect to the Site.

The complaint describes Emhart's liability for Site clean-up as based on the activities of a predecessor chemical manufacturing company that conducted business operations on a portion of the Site from the 1940s through about 1968. Ultimately, Emhart sought, among other things, an award for "the damages to which it is entitled as a result of the conduct of New England Container Company, Inc."[4]

---

[4] As noted, the complaint also levied claims against Travelers and PWIC as NE Container's insurers in connection with the policies that they had provided to NE Container. Emhart sought a judgment that, among others things, both Travelers and PWIC were obligated "to satisfy [NE Container's] obligations to Emhart with respect to the damages that Emhart will recover if it prevails." In 2007, the district court issued an order severing and staying Emhart's claims against Travelers and PWIC, "pending resolution of the underlying cost recovery action between Emhart and [NE] Container . . . ." Emhart Indus., Inc. v. New England Container Co., Inc., et. al, No. 06-CV-218S (D.R.I. Aug. 15, 2007) (Order).

## D. The District Court's Analysis

The district court determined that the complaint failed to show that the damage potentially "occurred" between 1982 and 1985. The court observed that by 1982, the start date of the PWIC insurance policy, NE Container no longer had any operations on the Centredale Manor Site, and there was no allegation that NE Container had any connection with the property in question during the mid-1980s policy time frame. Remarking that it had found no Rhode Island court decision holding that the coverage trigger "was satisfied when the policy period did not correspond at all to the period during which the insured conducted its allegedly harmful activities," the district judge underscored that, here, "there is not even a small speck of an overlap between the policy period and the period of the insured's allegedly damaging activities."

We agree with Travelers that looking only to the timing of NE Container's alleged polluting activities is too narrow a focus, and that Rhode Island law requires consideration of the potential timing of the property damage itself.

It is true, as the district court noted, that there is a dearth of Rhode Island case law on the bounds of the reasonable diligence coverage trigger. In fact, Textron-Gastonia and Textron-Wheatfield are about the only cases in which the state supreme court has explored the scope of this coverage trigger, see also Truk-Away of R.I., Inc. v. Aetna Cas. & Sur. Co., 723 A.2d 309

(R.I. 1999), but neither case did so in the context of an insurer's duty to defend, see Emhart Indus., 559 F.3d at 69 (discussing Textron cases and concluding that neither provided a holding on the insurers' duty to defend).  Even with little express direction from state precedents, however, we are confident that the "discoverable in the exercise of reasonable diligence" coverage trigger does not require a temporal overlap between the policy period and the insured's active business operations during which the allegedly damaging activity took place.  See, e.g., Travelers Indem. Co. v. Children's Friend & Serv., No. PC98-2187, 2005 WL 3276224, at *10-11 (R.I. Super. Ct. 2005) (unpub.) (ruling that under an occurrence-based general liability policy, the timing of the "property damage" is the relevant focal point for determining the potential for coverage and the insurer's duty to defend, and emphasizing that whether the causative event happened during or before the policy period is not material); Ins. Co. of N. Am. v. Kayser-Roth Corp., No. PC 92-5248, 1999 WL 813661, at *13, 27-28, 35 (R.I. Super. Ct. 1999) (unpub.) (following the CPC Int'l trigger framework and ruling that, at a time when the insured had already closed its facility and long sold the property to a third party, the insured could have discovered with reasonable diligence the environmental property damage resulting from a chemical spill event that took place during its business operations).

As construed by the Rhode Island courts, the very aim of that state's coverage trigger is to make clear that a covered "occurrence" can indeed take place when the latent injury or damage becomes manifest at some point down the road from the actual polluting event or activity. See Textron-Wheatfield, 754 A.2d at 746. The Rhode Island Supreme Court has explained that the reasonable diligence category of coverage trigger, in particular, is meant to address

> the problem of latent injury (such as asbestos poisoning) or latent damage (such as groundwater contamination), when the injury or damage, although covered by the policy, is not immediately discernible or occurs after an unexpected event sets in motion a series of incidents that eventually results in the manifestation of the damage.

Id. And, the tandem Textron decisions neither purport to truncate, nor operate to truncate, the supreme court's holding in CPC Int'l, which rejected a trigger-of-coverage test premised on when the injury-causing event occurred in favor of one focusing on the manifestation, discovery or discoverability with reasonable diligence of the resulting property damage. See CPC Int'l, 668 A.2d at 649-50. Instead, both cases simply display the application of the precedent established under CPC Int'l in the summary judgment setting, further clarifying that the trigger categories are independent of one another such that actual discovery of the property damage during the policy period is not required. See

-16-

Textron-Wheatfield, 754 A.2d at 745-46; Textron-Gastonia, 723 A.2d at 1141-42.

To be sure, in both Textron cases the insureds' polluting activity during the operation of their respective business facilities (including spills and leaks into the soil) overlapped with the policy periods at issue.  See Textron-Wheatfield, 754 A.2d at 744, 747; Textron-Gastonia, 723 A.2d at 1139, 1143-44.  Also in both cases, with respect to the insureds' reason to test for, and their ability to discover, the environmental damage during the policy period, the Rhode Island court noted evidence that their former employees had personal knowledge of the polluting activity taking place during the business operations.  See Textron-Wheatfield, 754 A.2d at 747; Textron-Gastonia, 723 A.2d at 1143-44.  One lesson to be drawn from these cases is that the ultimate resolution of the coverage trigger question between the insured and its insurer depends on evidence that the insured had some reason to test for the contamination and must actually have been able to discover it in the exercise of reasonable diligence during the policy period.  But, we read neither case as requiring a temporal overlap between the policy period and the alleged polluting activity during an entity's business operations.  In each case, the state supreme court simply was addressing the facts of the case as presented.

It may be difficult to unearth evidence and prove for indemnity purposes that property damage occurred in accord with the reasonable diligence coverage trigger during a time frame when the insured has long ceased its business operations that coincided with the pollution activity. Still, there is a vast array of factual circumstances in the progressive environmental damage context, and we must take our cue from the Rhode Island court's demarcation of an "occurrence" coverage trigger for delayed manifestation scenarios. Cf. Emhart Indus., 559 F.3d at 69 (concluding that the state court's silence on the duty to defend issue does not sufficiently support [the insurer-appellant's] claim that the Rhode Island Supreme court would not apply the pleadings test in the CERCLA context). Accordingly, we do not subscribe to the district court's narrower view that the Emhart complaint failed to show the potential that reasonably discoverable property damage occurred during the mid-1980s simply because there was no overlap between the policy period and NE Container's polluting activities. Without this constraint, we consider de novo whether the allegations in the complaint triggered PWIC's duty to defend. See Flori, 388 A.2d at 26.

**E. Sufficiency of the Allegations under the Pleadings Test**

PWIC contends that the occurrence of third-party property damage at the Site during the policy period that is attributable to NE Container's alleged polluting activities "is never even

intimated" in the Emhart complaint. Further, it says that there is a "complete absence" of any allegations showing that NE Container had a reason to test for environmental contamination or that any such property damage was capable of detection during the policy periods. In contrast, Travelers, although acknowledging that the Emhart complaint does not expressly identify the date on which property damage was discoverable at the Site, urges that a fair reading of the allegations in accord with the broad pleadings test shows a potential for coverage. Travelers has the better view.

The Emhart complaint alleges that the EPA named both Emhart and NE Container, among others, as the sources of the environmental damage found throughout the Superfund Site, a site that incorporates a broad swath of contaminated land and water extending beyond the boundaries of NE Container's former facility. The complaint's description of NE Container's polluting activities consists of "spills and leaks" of chemical-laden residuals from the drums, as well as the release of hazards resulting from the incineration of the drums. This pollution may have taken place during the entire course of the facility operations, allegedly spanning from 1952 until the early 1970s. Additionally, according to the complaint, NE Container's activities caused releases of hazardous substances "at and from the Site." Finally, the complaint notes that the eventual discovery of widespread environmental damage in the late 1990s allegedly showed damage both

at and in the vicinity of the NE Container site, including both land and water contamination.

Fairly read, these allegations give rise to the potential that NE Container's polluting activities may have spanned two decades, and that the pollution migrated from NE Container's property and eventually caused damage to surrounding land and waterways, which damage was discovered in 1999. While the complaint does not include specific allegations showing when property damage became detectable, the potential magnitude of NE Container's alleged polluting activities supports a reasonable inference that property damage was discoverable in the exercise of reasonable diligence some time before its actual discovery, including during the policy period. Certainly, the complaint raises many questions about the timing and scope of the damage allegedly caused by NE Container, and about whether NE Container had a reason to test for damage at the Site and could have detected damage during the policy period. But faithful application of the pleadings test leads us to conclude that the allegations give rise to the potential that a state of facts exists demonstrating that environmental property damage caused by NE Container was discoverable in the exercise of reasonable diligence at the Site during the PWIC policy period.

It also bears observing that the question of when latent environmental damage became reasonably discoverable is ultimately

a fact-intensive matter, often requiring considerable investigation which may not necessarily take place prior to the inception of a private contribution action between multiple polluters. Indeed, while the specific timing of the discoverability of latent property damage allegedly caused by the defendant-polluter is crucial for purposes of implicating coverage under a particular insurance policy, it is not central to the private contribution action. Cf. Emhart Indus., 559 F.3d at 66, 75 (noting that the EPA document does not speak to the discoverability of the environmental damage because such issue is unrelated to CERCLA liability). Thus, the lack of additional specificity in the Emhart complaint does not foreclose the insurer's duty to defend its insured where the allegations show a potential that a state of facts exists that will bring the case within the coverage afforded under the policy.

PWIC acknowledges -- as it must -- that under Rhode Island law, neutral or ambiguous allegations do not foreclose an insurer's duty to defend. But it contends that the complete absence of specific allegations connecting NE Container to the property during the policy period precludes the Emhart complaint from being characterized as ambiguous or neutral on the potential for coverage. We disagree.

We previously have remarked that Rhode Island law on the duty to defend "may mean that when one cannot tell what claim is being asserted against the insured but it may be one covered by the

policy . . . the duty to defend continues, at least until the scope of the claim is brought into focus." Hartford Fire Ins. Co. v. R.I. Pub. Transit Auth., 233 F.3d 127, 131 (1st Cir. 2000). Rhode Island cases display a consistent message: lack of specificity in a complaint leaving in doubt whether a state of facts exists showing the case is within the risk of coverage, or pleadings that display the existence of a question of fact regarding coverage, trigger the duty to defend, and that duty continues until such time as facts are shown to foreclose coverage (or the parties settle). See, e.g., Allstate Ins. Co. v. Russo, 641 A.2d 1304, 1306 (R.I. 1994); Shelby Ins. Co., 767 A.2d at 77; Flori, 388 A.2d at 27; Beals, 240 A.2d at 403. An insurer has no duty to defend at the inception of a lawsuit against its insured only where the pertinent charging document plainly shows no potential for coverage. See, e.g., Sanzi v. Shetty, 864 A.2d 614, 618 (R.I. 2005); Truk-Away, 723 A.2d at 311-12; Craven v. Metro. Prop. and Cas. Ins. Co., 693 A.2d 1022, 1022 (R.I. 1997) (mem.); Viegas, 667 A.2d at 789; see also Narragansett Jewelry Co., Inc. v. St. Paul Fire and Marine Ins. Co., 555 F.3d 38, 41 (1st Cir. 2009) (applying Rhode Island pleadings test to hold that the insurer had no duty to defend where the allegations in the complaint plainly compelled a conclusion that an exclusion to coverage applied).[5]

---

[5] In unrelated litigation, the district court has concluded that Rhode Island law permits it to look beyond the complaint when necessary "to avoid permitting the pleading strategies, whims, and

Our reading of Rhode Island law on the liberality of the pleadings test for purposes of the duty to defend also is consistent with the approach of other jurisdictions that abide by the pleadings test or some corollary thereto.  The cases generally hold that an insurer has a duty to defend its insured where the complaint allegations are vague, ambiguous, or incomplete such that the potential for coverage exists.  See, e.g., New York v. Blank, 27 F.3d 783, 790 (2d Cir. 1994) (interpreting New York law and collecting cases); Monsler v. Cincinnati Cas. Co., 598 N.E.2d 1203, 1206 (Ohio 1991); Marleau v. Truck Ins. Exch., 37 P.3d 148, 153 (Or. 2001); Parker v. Hartford Fire Ins. Co., 278 S.E.2d 803, 804 (Va. 1981); Truck Ins. Exch. v. Vanport Homes, Inc., 58 P.3d 276, 281-82 (Wash. 2002) (en banc); see also William T. Barker, New Appleman on Insurance: Current Critical Issues in Insurance Law § III.C (April 2007) (emphasizing that "given the vagueness of notice pleading, the insured ought not to be deprived of a full defense of a covered claim" arising from ambiguities; "ambiguities in the complaint must be construed in favor of coverage until those ambiguities can be resolved.").[6]

---

vagaries of third party claimants to control the rights of parties to an insurance contract," and "to ensure a degree of 'reasonableness.'"  See Allstate Ins. Co. v. Greloch, No. 11-015, 2011 WL 4351630, at *4 n.3 (D.R.I. 2011) (unpub.) (internal quotation marks and citations omitted).  This approach is not discussed by the parties.

[6] PWIC urges a more exacting review of the Emhart complaint, arguing that a direct action against third-party insurers "raises

-23-

On another front, PWIC also argues that following Travelers's reading of the Emhart complaint is akin to adopting the "continuous trigger" test, which PWIC says is contrary to Rhode Island's test under CPC Int'l. We disagree.

Generally stated, a "continuous trigger" coverage standard "charges a loss to policies in effect from the time of exposure to manifestation, and, thus, presumes injury from the time of exposure through manifestation." Emhart Indus., 559 F.3d at 77 (emphasis added) (internal quotation marks omitted). In contrast, Rhode Island's pleadings test triggers the duty to defend only when the pleading allegations show the potential that property damage occurred during the policy period. See id. at 77-78; see also 23 Eric Mills Holmes, Holmes' Appleman on Insurance 2d § 145.3[2][a] (2003) (interim volume) (characterizing the CPC Int'l Rhode Island standard as a manifestation trigger of coverage); Thomas, supra § 27.01[7][g] (explaining the overlap between coverage trigger theories).[7] As our holding in this case does not presume injury

the bar" with respect to what Emhart had to establish in the complaint. Because PWIC provides no legal authority for this approach, we do not address its merits. See Zannino, 895 F.2d at 17. For the same reason, we do not consider the appellee's contention that NE Container "could not have had any reason to test" for pollution damage because it lacked a legal right to enter the Site property during the relevant policy period.

[7] It is not necessarily certain that the Rhode Island Supreme Court has put to rest the continuous trigger test in the environmental context. See Textron-Gastonia, 723 A.2d at 1141 ("Because we conclude that liability under the policy may be established by one of the recognized CPC tests, we need not address

-24-

from the time of exposure to manifestation, it compels neither a defense nor indemnity under a continuous trigger rubric. We conclude only that the complaint allegations show the potential that property damage was discoverable in the exercise of reasonable diligence during the mid-1980s.

PWIC's final argument is that NE Container's polluting activity does not comport with the definition of "occurrence" and, moreover, it implicates the pollution exclusion under PWIC's policies. We are not convinced.

As explained earlier, an "occurrence" covered under the PWIC policies means "an accident, including injurious exposure to conditions, which results in . . . property damage neither expected nor intended from the standpoint of the insured." With respect to property damage that is caused by pollution, the PWIC policies cover property damage arising from the "discharge, dispersal, release or escape" of a contaminant only if such activity or event was "sudden and accidental." See Textron-Wheatfield, 754 A.2d at 750 (construing the pollution exclusion to mean that coverage is barred for the intentional or reckless polluter).

_____

the continuous trigger-of-coverage standard."); see also Emhart Indus., 559 F.3d at 79 (declining to address merits of the appellee's "considered dicta" argument regarding the Textron-Gastonia remark, because the appellee had failed to distinguish CPC Int'l as the operative ruling). We have no need to wade into this thicket.

-25-

The Emhart complaint describes NE Container's polluting activity as including the spilling and leaking of chemical-laden residual contents of the drums when bringing the drums to the incinerator. Without addressing how this complaint allegation could be said to prevent the potential for coverage, PWIC points only to the 2000 EPA unilateral administrative order as support for its position that "there is no indication in any of the charging documents that NECC's course of conduct [during its regular operations] was accidental or unintentional." The EPA order generally avers that NE Container "dispos[ed] of certain drum residuals in the soil at the Site and incinerat[ed] other drum residuals at the Site." Yet, PWIC makes no attempt to demonstrate how these general allegations foreclose the potential that such activity and resulting damage conform to the terms of coverage under its policies. See, e.g., id. (holding that while the pollution exclusion "bars coverage for the intentional or reckless polluter," it provides coverage to the insured which acts in good faith but "still experiences unexpected and unintended releases of toxic chemicals that cause damage," and also noting that whether an insured was an intentional or reckless polluter is "usually a matter for fact-finding at trial").

Moreover, there is no indication in the record that the EPA document was attached to the Emhart complaint, and PWIC makes no effort to address well-established state law forbidding

consideration of extrinsic evidence when applying the pleadings test.  See Flori, 388 A.2d at 26; Beals, 240 A.2d at 403; Thomas, 93 A.2d at 312.  Rather, it cites to Emhart Indus., 559 F.3d 57, to support its cursory suggestion (posited in the statement of facts of its appellate brief) that an EPA unilateral administrative order can be considered a charging document for purposes of the duty to defend.  While this may be true where an insurer is asked to provide a defense against an EPA action, that is not this case; PWIC is being called upon to join the defense of its insured in a private contribution action.

PWIC also says in passing (again, in the statement of facts) that the 2000 EPA action "is incorporated by reference in the [Emhart] Complaint."  State law, however, points another way, and PWIC has not given any attention to that authority.  See, e.g., Bowen Court Assocs. v. Ernst & Young, LLP, 818 A.2d 721, 726 (R.I. 2003) (holding that the mere fact that a pleading mentions or refers to a document, without attaching it to the pleading, does not cause that document to be incorporated by reference as if the pleader had appended it to the pleading).

In the end, we conclude that under the pleadings test, the Emhart complaint triggered PWIC's duty to defend under its policies issued in the mid-1980s.  In so holding, we recognize that there is exponentially more to this sprawling litigation than the Emhart complaint and the PWIC policies.  Litigation involving

-27-

environmental damage at the Superfund Site was well on its way prior to the 2006 Emhart action, and the Emhart action had advanced beyond a nascent stage by the time Travelers pursued its 2010 action against PWIC.  The duty to defend question before us, however, begins and ends with the Rhode Island pleadings test. Having concluded this task, our review is complete.[8]

### III. Conclusion

We **reverse** the district court's decision, **vacate** the judgment in favor of PWIC, and **remand** for the district court to enter judgment in favor of Travelers that the Emhart complaint triggered PWIC's defense obligations under its policies.  Any remaining requests for relief sought by Travelers will be addressed by the district court in due course.

---

[8] PWIC advanced other arguments before the district court to negate its duty to defend, such as late notice and known loss, which the court rejected. PWIC does not challenge these rulings.